**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| TECHSYS INSIGHTS, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br><br>VERIZON COMMUNICATIONS, INC., VERIZON BUSINESS NETWORK SERVICES LLC, VERIZON ENTERPRISE SOLUTIONS, LLC, CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, VERIZON DATA SERVICES LLC, VERIZON BUSINESS GLOBAL, LLC, VERIZON SERVICES CORP., VERIZON ONLINE LLC, MCI COMMUNICATIONS SERVICES LLC D/B/A VERIZON BUSINESS SERVICES, AND VERIZON LONG DISTANCE LLC<br><br>*Defendants*. | ) | C.A. No. [_________]<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff TechSys Insights, LLC ("TechSys" or "Plaintiff"), by and through its undersigned attorneys, alleges the following against Defendants Verizon Communications, Inc., Verizon Business Network Services LLC, Verizon Enterprise Solutions, LLC, Cellco Partnership d/b/a Verizon Wireless, Verizon Data Services LLC, Verizon Business Global LLC, Verizon Services Corp., Verizon Online LLC, MCI Communications Services LLC d/b/a Verizon Business Services, and Verizon Long Distance LLC (collectively, "Defendants" or "Verizon"):

1. Verizon has willfully copied TechSys's patented technology and incorporated that technology throughout their entire fiber optic network. Worse, Verizon met with TechSys multiple times under non-disclosure agreements and received full access to the patented technology over a

decade ago. Verizon gave the impression that it was willing to partner with TechSys to bring this technology to market—even complimenting the enormous benefits of the technology—only to dismiss TechSys and implement the technology without authorization or compensation.

2. TechSys brings this action for infringement of three foundational patents covering optical demarcation, client grooming, and spectral defragmentation technologies for fiber-optic networks. These patents—U.S. Patent Nos. 8,989,591 ("the '591 patent"), 9,014,558 ("the '558 patent"), and 9,020,350 ("the '350 patent") (collectively, the "Patents-in-Suit" or "Asserted Patents")—address fundamental network architectural challenges that, at the time of invention, constrained the efficiency and cost-effectiveness of optical transport networks. The inventions have been widely copied in other fiber optic networks and form the basis for proposals for further improvements being touted by the entire industry: network providers, equipment manufacturers, and industry organizations alike. TechSys's patented technology already underpins the architectures implemented throughout fiber optic networks today, but those networks, including Verizon's offerings, operate without license or authorization and infringe TechSys's patents.

3. The inventors of the Asserted Patents and TechSys's founders—Hal Kauffeldt and Edward Sullivan—are pioneers in their field who combined decades of experience as optical engineers at companies like Fujitsu and Nortel with an innovative perspective. Their unique backgrounds allowed them to step outside the traditional confines of the industry to solve architectural problems long inhibiting progress in fiber-optic networking. The Asserted Patents provide foundational technology that has enabled the industry's decade-long transition to more flexible, software-defined, and open optical network architectures. Major equipment vendors have recognized numerous advantages from adoption of the technology, including "[i]mproved network

efficiency and operational simplification." Verizon was among the first to recognize the technology's value but refused to pay for the use of this technology.

4. TechSys's founders were driven by a genuine belief in the value of their technology and a desire to advance the fiber-optic telecommunications industry. They actively reached out to major telecommunications providers and optical network equipment manufacturers in an effort to partner with them and develop products that would implement this revolutionary network architecture. TechSys sought to drive industry-wide adoption of the technology for the benefit of the broader telecommunications industry. For example, TechSys approached Verizon to explore a collaborative partnership, and Verizon expressed significant interest.

5. By April 2013, Verizon's Vice President of Network Planning and Chief Fiber Architect, Glenn Wellbrock, had personally reviewed TechSys's patented technology and recognized its value. In the first of multiple in-person meetings Verizon had with the inventors, Mr. Wellbrock declared 15 minutes into the presentation of the patented technology: "Stop. I get it. Tell our suppliers we want this."

6. During that same meeting, in which the details of the patented technology were discussed, Verizon's engineers acknowledged the benefits they would receive from implementing the patented technology (including initial estimates of savings of up to 78% in OPEX and 32% in CAPEX), and even identified many additional advantages the implementation would provide them (including simplifying the network and improving reliability, flexibility and serviceability). Despite this recognition, Verizon's subsequent implementation of the technology, and the industry's subsequent widespread adoption of the patented architecture, Verizon never followed through on a partnership or obtained a license.

7. Verizon also directed TechSys to have discussions with its fiber optic equipment suppliers so that Verizon could obtain the equipment necessary to implement the patented network architecture. TechSys met with several of them in the 2013-2014 time period—including Fujitsu—and provided detailed technical briefings on the patented technology. Verizon's equipment manufacturers also recognized the benefits of the technology, but because the patented architecture would reduce the need (and therefore the demand) for some of their most expensive optical equipment, they declined to partner with TechSys. Verizon had recognized this as a potential obstacle and conveyed to the manufacturers that it would make up the difference (*i.e.*, pay a higher price for the new equipment to match what it had been paying for the legacy optical equipment) because of the significant additional benefits Verizon would receive from implementing the patented technology, including the OPEX savings, improved flexibility, scalability, and serviceability identified above. Despite this commitment, it was not enough to convince the manufacturers to alter their existing business models.

8. But like many revolutionary technologies, these economic forces could not prevent the eventual widespread adoption of the more advanced and efficient architecture. Each of these manufacturers, driven by the demands of Verizon and other fiber optic network providers, incorporated the necessary features and components to enable their equipment to be used in the patented network architecture. Verizon now uses that same equipment throughout its nationwide fiber-optic network to implement the patented architectures. Yet, despite multiple opportunities to work with TechSys or to acquire a license for its widespread use of the technology disclosed to it more than a decade ago, Verizon has failed to fairly pay for its use of the patented technology.

9. In the years since TechSys disclosed its inventions to Verizon and its equipment suppliers, the entire industry has shifted toward the patented architecture. Standards organizations

have proposed adopting aspects of the patented technology. Major equipment vendors have publicly described the architecture as the "advocated position" and documented capital-expenditure reductions of 50% to 64% and operating-expenditure savings of 67% to 76% from its adoption. Entirely new product lines have emerged to take advantage of the key improvements offered by the patented technology. This action seeks to recover damages from one of the first to benefit from this revolutionary new technology and the entity that continues to infringe TechSys's patent rights to this day: Verizon.

## **NATURE OF THE ACTION**

10. This is a civil action for infringement of the '591, '558, and '350 patents arising under the patent laws of the United States, 35 U.S.C. §§ 271 *et seq*.

11. The Asserted Patents cover fiber optic network architectures, systems, and techniques using optical demarcation, client grooming, and spectral defragmentation technologies.

12. Verizon has made, used, offered for sale, sold, and/or imported into the United States systems, devices, and/or services that infringe one or more claims of each of the Patents-in-Suit in connection with its nationwide fiber-optic network. The accused systems, devices, and services include, without limitation: Verizon's fiber optic network, SD-WAN architecture and services; broadband access services; wavelength services; Verizon data centers; Managed Optical Fiber Network ("MOFN") services; Spectrum Services; Data Center Interconnect ("DCI") services; managed enterprise services; business and consumer fiber-optic services; AI-related network services; wireless and cellular services (including 5G), and any other services or products that rely on the fiber-optic backbone; metro, regional, and long-haul fiber-optic network infrastructure; interconnections with other service-provider networks; and all equipment, software, and systems

used to provide such services, including equipment from vendors such as Ciena, Nokia, Ericsson, and Fujitsu.

13. Verizon's infringement is intentional, willful, and ongoing. Verizon has had knowledge of TechSys's patented technology since at least 2013, when the inventors and TechSys founders personally presented the technology to Verizon's Vice President Glenn Wellbrock and other Verizon engineers such as Tiejun J Xia. At the time of those meetings, TechSys informed Verizon that the material being presented was the subject of pending patent applications at the United States Patent Office. The presentations disclosed the subject matter in subsequently issued patent claims. Verizon therefore had actual knowledge of the pending patent applications and the inventive technology disclosed therein, and, on information and belief, Verizon has been aware of the Patents-in-Suit since they issued in 2015. Despite Mr. Wellbrock's and Verizon's recognition of the technology's value and Verizon's subsequent adoption and deployment of the patented architecture and techniques throughout its network, Verizon has failed to obtain a license from TechSys.

**THE PARTIES**

14. Plaintiff TechSys Insights, LLC is a Texas limited liability company with its principal place of business in Plano, Texas. TechSys was founded by Hal Kauffeldt and Edward Sullivan, the named inventors of the Patents-in-Suit.

15. Defendant Verizon Communications, Inc. is a Delaware corporation with its principal place of business at 1095 Avenue of the Americas, New York, NY 10036. Verizon Communications, Inc. has designated The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 as its agent for service of process. Verizon

Communications, Inc. is the ultimate parent company that directs and controls the actions of all Verizon subsidiaries, including Verizon's enterprise-wide deployment of the accused technology.

16. Defendant Verizon Business Network Services LLC is a Delaware limited liability company with its principal place of business at 22001 Loudoun County Parkway, Ashburn, Virginia 20147. On information and belief, Verizon Business Network Services LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Verizon Business Network Services LLC directly operates and delivers services through Verizon's fiber optic networks—including through Verizon facilities and fiber optic equipment in this District—including the SD-WAN, MOFN, wavelength, and DCI services accused of infringement. Its customer-facing fiber-optic transport and managed network services are among the activities that practice the Asserted Patents.

17. Defendant Verizon Enterprise Solutions LLC is a Delaware limited liability company with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920. Verizon Enterprise Solutions LLC has designated the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 as its agent for service of process. Verizon Enterprise Solutions LLC is the commercial face of Verizon's enterprise offerings and is responsible for marketing, selling, and supporting managed services—including SD-WAN—that traverse the infringing fiber-optic infrastructure, including through Verizon facilities and fiber optic equipment in this District. It also provides instructions, technical support, documentation, and marketing materials encouraging customers to use the accused systems, products, and services.

18. Defendant Cellco Partnership d/b/a Verizon Wireless is a Delaware general partnership with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920. On information and belief, Cellco Partnership may be served through its registered agent,

The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Cellco Partnership operates Verizon's wireless network, including 5G and 4G LTE services—including cellular base stations and equipment in this District—which use the fiber-optic backbone implementing the patented optical demarcation, client grooming, and defragmentation technology.

19. Defendant Verizon Data Services LLC is a Delaware limited liability company with its principal place of business at 7701 E. Telecom Parkway, Mail Code B3E, Temple Terrace, Florida 33637. On information and belief, Verizon Data Services LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Verizon Data Services LLC operates Verizon's data-centers and data-services—including through Verizon facilities and fiber optic equipment in this District—that rely on the accused fiber-optic network, including DCI services and data-center interconnections.

20. Defendant Verizon Business Global LLC is a Delaware limited liability company with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920. On information and belief, Verizon Business Global LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Verizon Business Global LLC provides international and cross-border enterprise services that rely on the same accused fiber-optic backbone and SD-WAN architecture—including through Verizon facilities and fiber optic equipment in this District.

21. Defendant Verizon Services Corp. is a Delaware corporation with its principal place of business at 1717 Arch Street, 21st Floor, Philadelphia, PA 19103. On information and belief, Verizon Services Corp. may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Verizon Services

Corp. is Verizon's shared-services entity that manages procurement, vendor relationships, and operational support for the network—including relationships with the major equipment vendors that Verizon uses to the practice the patented technology.

22. Defendant Verizon Online LLC is a Delaware limited liability company with its principal place of business at 22001 Loudoun County Parkway, Ashburn, VA 20147. On information and belief, Verizon Online LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Verizon Online LLC is responsible for Verizon's consumer broadband and internet access services—including through Verizon facilities and fiber optic equipment in this District.

23. Defendant MCI Communications Services LLC d/b/a Verizon Business Services is a Delaware limited liability company with its principal place of business at 22001 Loudoun County Parkway, Ashburn, VA 20147. On information and belief, MCI Communications Services LLC d/b/a Verizon Business Services may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. MCI Communications Services LLC d/b/a Verizon Business Services is the legacy MCI entity that operates a substantial portion of Verizon's long-haul and enterprise fiber-optic network, including through Verizon facilities and fiber optic equipment in this District.

24. Defendant Verizon Long Distance LLC is a Delaware limited liability company with its principal place of business at One Verizon Way, Basking Ridge, NJ 07920. On information and belief, Verizon Long Distance LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Verizon Long Distance LLC provides long-distance telecommunications services over Verizon's

long-haul fiber-optic network infrastructure, including through Verizon facilities and fiber optic equipment in this District.

25. On information and belief, Verizon Business Network Services LLC, Verizon Enterprise Solutions LLC, Cellco Partnership d/b/a Verizon Wireless, Verizon Data Services LLC, Verizon Business Global LLC, Verizon Services Corp., Verizon Online LLC, MCI Communications Services LLC d/b/a Verizon Business Services, and Verizon Long Distance LLC are direct or indirect subsidiaries of Verizon Communications, Inc. *See,* Exhibit E (Verizon Communications Inc., Annual Report (Form 10-K), at 4 (Feb. 17, 2026)) ("Verizon Communications Inc. (the Company) is a holding company that, acting through its subsidiaries (together with the Company, collectively, Verizon), is one of the world's leading providers of communications, technology, information and streaming products and services . . . ."); *id.*, at Ex. 21, pg. 311 (listing principal subsidiaries). On information and belief, Verizon Communications, Inc. directs or controls the actions of these entities, including by inducing or contributing to the acts alleged herein. Each of these Defendants operates as part of a unified Verizon enterprise, sharing common infrastructure, personnel, and operations within this District, such that the regular and established place of business of each entity in this District is attributable to the coordinated activities of all Defendants. *See* Exhibit E, at 57 ("The consolidated financial statements include our controlled subsidiaries ...."). Moreover, on information and belief, Verizon Communications, Inc. owns and controls, directly or indirectly, the actions of its US subsidiaries, and the profits each entity receives from the acts described herein flow back to Verizon Communications, Inc. Therefore, the acts of each subsidiary and entity are attributable to Verizon Communications, Inc. and to each subsidiary-entity under principles of agency and/or alter ego. *Celgard, LLC v. SK Innovation Co*., 792 F.3d 1373, 1379 (Fed. Cir. 2015).

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

27. This Court has personal jurisdiction over Defendants. Each Defendant conducts business in this District and has committed, induced, and contributed to acts of patent infringement in this District, elsewhere in Texas, and elsewhere in the United States. Defendants' contacts with Texas and this District are sufficient to establish both general and specific personal jurisdiction. Defendants have purposefully availed themselves of the privilege of conducting business in Texas by, among other things, operating fiber-optic network infrastructure within the District, providing telecommunications services to customers throughout the District, maintaining retail locations and offices in the District, employing personnel in the District, and deriving substantial revenue from customers in the District. The causes of action alleged herein arise directly from Defendants' forum-related activities, including their sale and provision of products and services to customers in this District using the patented technology. As set forth in the Parties section above, each Defendant engages in specific infringing activities within this District through Verizon's unified fiber-optic network infrastructure.

28. Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because Defendants have committed acts of infringement and have regular and established places of business in this judicial district. On information and belief, and as set forth in the preceding paragraph and the Parties section above, Verizon maintains physical infrastructure, including fiber-optic network facilities, offices, retail stores, point-of-presences ("POP"), data centers, and/or other regular and established places of business within the Eastern District of Texas. Verizon provides

telecommunications services, including fiber-optic network services, to customers throughout this District.

29. For example, Verizon operates a nationwide fiber-optic backbone network within the United States, including an Ultra Long Haul ("ULH") optical transport network connecting metropolitan markets across the country. *See* Verizon Business, *Wavelength Ultra Long Haul (ULH) Route Map* (describing the "Verizon Ultra Long Haul (ULH) backbone transport network between metro markets") (https://www.verizon.com/business/resources/infographics/wavelength-ultra-long-haul-route-map.pdf); Verizon Business, *Wavelength Services* (describing Verizon's "Ultra Long Haul (ULH) optical transport network" and its use of dense wavelength-division multiplexing ("DWDM")) (https://www.verizon.com/business/products/networks/connectivity/wavelength-services).

30. On information and belief, one or more of these fiber-optic networks are within Texas and within this District. *See, e.g.*, https://www.texarkanagazette.com/news/2023/oct/31/local-verizon-wireless-customers-to-get-5g/.



https://www.verizon.com/business/resources/infographics/wavelength-ultra-long-haul-route-map.pdf.

31. As another example, Verizon operates fiber-optic network infrastructure within this District, including Verizon Business fiber infrastructure formerly operated as part of the MCI/WorldCom network. Public utility records identify Verizon fiber facilities in multiple locations within this District, including in Plano and Allen, Texas, in Collin County; Palestine, Texas, in Anderson County; Longview, Texas, in Gregg County; and Texarkana, Texas, in Bowie County. The City of McKinney also identifies physical "Verizon-MCIFiber" routes within McKinney, Texas.

https://maps.mckinneytexas.org/mckinney/rest/services/MapServices/Utilities/MapServer/layers.

| | | | | |
|---|---|---|---|---|
| Verizon Texas Business | VZBTX | VERIZON FIBER ONLY - "Formerly known as MCI, Worldcom." Lubbock, Abilene, Midland, Ft. Worth, Forest Hill, Haltom City, Richland Hills, Blue Mound, Saginaw, Hurst, Euless, Bedford, Roanoke, Arlington, Pantego, Kennedale, Dalworthington Gardens, Trophy Club, Hebron, Carrollton, Plano, Allen, Addison, Farmers Branch, Irving, Dallas, Highland Park, Richardson, University Park, Round Rock, Austin, San Antonio, Waco, Palestine, Crockett, Spring, Houston, Friendswood, Bryan, College Station, Del Rio, Longview, Texarkana, McAllen, El Paso Added james.j.drulia@verizon.com 12/7/18 | Texas | Anderson, Bexar, Bowie, Brazos, Cass, Collin, Dallas, Denton, El Paso, Ellis, Gregg, Harris, Hidalgo, Houston, Lubbock, McLennan, Midland, Tarrant, Taylor, Travis, Val Verde, Williamson |

https://forms.njuns.com/publicmemberlist?state=Texas

32. As another example, Verizon operates fiber-optic backbone infrastructure and maintains points-of-presence (POP) within this District. For example, Verizon's network operates a long-haul fiber system in Longview, Texas, in Gregg County. Specifically, Verizon operates a long-haul interconnection facility at 119 E. Tyler Street, Longview, TX, where long-haul networks interconnect.




https://longviewusa.com/assets/main/studies-reports/06_3_2121-longview-texas-connectivity-report.pdf.

33. As another example, on information and belief, Verizon serves the majority of cell sites with its own deployed fiber-optic cables. https://www.telecompetitor.com/verizon-50-of-cell-sites-to-be-served-by-its-own-fiber-by-years-end/. Verizon operates cell sites in Texas and in this District that, on information and belief, are serviced by Verizon's fiber optic network. https://www.texarkanagazette.com/news/2023/oct/31/local-verizon-wireless-customers-to-get-5g/.




https://www.verizon.com/coverage-map/.

34. Verizon has numerous employees in the State of Texas, and in or near this judicial district, who work on fiber-optic networks. On information and belief, at the time of filing this Complaint, Verizon employs individuals described as "Fiber Support" in Richardson, TX; and "Sr. Director Optical Transport Planning" in McKinney, Texas.

35. As another example, Verizon maintains Verizon stores that provide, offer to sell, and sell cellular and fiber optic services at least at 500 E Loop 281, Longview TX 75605. https://www.verizon.com/business/locations/tx/longview/500-e-loop-281-2245197/?cjdata=MXxOfDB8WXww&CMP=afc_m_p_cj_na_ot_2022_99&SID=cba-8e356e01-809f-48b6-a9f7-edfb97b690a0&cjevent=dcce38e5a55811f182c1026c0a82b82c&vendorid=CJM&PID=100357191&AID=11365093. Numerous additional Verizon retail stores are located within this judicial District, including in Allen, Athens, Beaumont, Canton, Carthage, Denton, Frisco, Gilmer, Henderson, Kilgore, Lindale, Longview, Lufkin, Marshall, Nacogdoches, Sulphur Springs, Texarkana, and Tyler. https://www.verizon.com/stores/.

36. Verizon's fiber optic networks are used to support various services including, but not limited to, cellular backhaul, broadband internet access, wavelength services, Managed Optical Fiber Network ("MOFN"), data center services, Spectrum Services, and Data Center Interconnect ("DCI"), as well as its fiber-optic backbone, metro and regional networks, cellular and 5G back-end infrastructure, and interconnections with other service-provider networks, and cable television offerings. These services are provided under brand names including, but not limited to, "Verizon," "5G," "5G Ultra Wideband," and "Fios," among other services, in the State of Texas and in this District.

37. Venue is proper over each Defendant in this District under 28 U.S.C. § 1400(b). On information and belief, each Defendant has committed acts of infringement in this District and has a regular and established place of business here. As set forth in the Parties section above, each Defendant operates within this District as part of Verizon's unified fiber-optic network infrastructure. Each Defendant—through Verizon's unified enterprise operations—maintains physical infrastructure (including fiber-optic network facilities, cellular infrastructure, data centers, and retail locations), provides fiber optic and telecommunications services to customers throughout this District utilizing the accused infringing technology, and employs personnel within this District. The specific infringing activities of each Defendant within this District are set forth in detail in the Parties section above. Verizon's own SEC filings confirm this unified enterprise structure: Verizon Communications, Inc. operates as "a holding company that, acting through its subsidiaries (together with the Company, collectively, Verizon)" and consolidates all subsidiaries in its financial statements. *See,* Exhibit E at 4, 57. Accordingly, the infringing acts and physical presence of each subsidiary within this District are attributable to each Defendant as part of the unified Verizon enterprise.

38. Moreover, Plaintiff TechSys Insights, LLC is located in Plano, Texas, within the Eastern District of Texas. The Patents-in-Suit were developed in and arise from work conducted within this District. Meetings were held in this district between TechSys and Verizon in which the patented technology was disclosed and discussed. These meetings between representatives of TechSys and Verizon were held at Verizon's office located at 2400 N. Glenville Dr., Richardson, TX 75082.

39. Defendants are properly joined under 35 U.S.C. § 299(a)(1) because, as set forth in greater detail below, on information and belief, Defendants commonly and/or jointly make, use, sell,

offer to sell, and/or import infringing instrumentalities, such that at least one right to relief is asserted against Defendants jointly, severally, and in the alternative with respect to the same transactions, occurrences, or series of transactions or occurrences relating to the making, using, selling, offering to sell, and/or importing into the United States the same accused instrumentalities, as set forth in greater detail herein.

40. Defendants are properly joined under 35 U.S.C. § 299(a)(2) because, as set forth in greater detail below, on information and belief, Defendants make, use, sell, offer to sell in, and/or import into the United States the same or similar accused instrumentalities, such that questions of fact that are common to all Defendants will arise in this action.

## THE ASSERTED PATENTS

41. The Asserted Patents relate to optical demarcation, client grooming, and defragmentation technologies for fiber-optic networks. These technologies can provide concrete and tangible benefits, including reducing operating costs and capital expenses, increasing operational flexibility and network capacity, improving the efficiency of controlling optical parameters, among other benefits and advantages.

### The ’591 Patent (Optical Demarcation)

42. The USPTO duly issued the ’591 patent, entitled “Remote optical demarcation point,” on March 24, 2015. The ’591 patent names Hal V. Kauffeldt and Edward T. Sullivan as inventors. A true and correct copy of the ’591 patent is attached hereto as Exhibit A.

43. Plaintiff TechSys is the owner by assignment of all rights, title, and interest in and to the ’591 patent by virtue of an assignment from the inventors to TechSys recorded at the USPTO at Reel/Frame 034888/0926.

44. The ’591 patent issued from U.S. Application No. 13/490,314, filed June 6, 2012, which was published as U.S. Patent Application Publication No. US2013/0330079 A1.

45. As described in the ’591 patent, the patent addresses limitations of prior approaches in optical network architectures for the transmission of optical signals by establishing a remote optical demarcation point that provides the service provider/optical domain with control of those signals: “Although both approaches above enable the SP to get access to information related to the optical parameter settings of WDM optics, they still fall short of the traditional model where the SP has independent control over all WDM optical signals entering their network.” ’591 patent, 3:21-26. The new architecture enabled the reduction of expensive and redundant optical equipment, as well as numerous other potential advantages. *Id.*, 2:14-35; 4:36-5:29.

46. The ’591 patent describes “apparatus, systems and methods enabling a service provider to establish an optical demarcation point located at or within equipment controlled at least in part within a customer’s domain such that the service provider’s domain is able to directly control access of an optical signal to their domain.” ’591 patent, Abstract. The system and methods described include a customer controller and a provider controller that may be managed within a service provider’s network, where the provider controller is configured to enable and to prohibit the transmission of one or more optical data plane signals in the network.

47. The patent provides in one example that “blocking the access of the optical signal to the SP’s network will be done by the Master at the SP edge node. This blocking forms at least a part of the control over the access of the optical data plane signal into the SP’s domain, while control over one or more of the optical signal parameter values may also form at least a part of said access control.” *See* ’591 patent, 13:62–14:1. Other examples are also provided. The optical demarcation patents can therefore allow service providers to move the optical interface closer to the IP-domain

equipment and eliminate their reliance on redundant equipment, thereby reducing costs and improving service agility.

48. The ’591 patent issued with 33 claims. Each claim in the ’591 patent recites an independent invention, and no single claim should be construed as representative of all claims in the ’591 patent.

49. The ’591 patent is valid and enforceable and enjoys a statutory presumption of validity pursuant to 35 U.S.C. § 282. The claims of the ’591 patent satisfy all requirements for patentability and patenting under 35 U.S.C., including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112.

**The ’558 Patent (Client Grooming)**

50. The USPTO duly issued the ’558 patent, entitled “Client grooming interface,” on April 21, 2015. The ’558 patent names Edward T. Sullivan and Hal V. Kauffeldt as inventors. A true and correct copy of the ’558 patent is attached hereto as Exhibit B.

51. Plaintiff TechSys is the owner by assignment of all rights, title, and interest in and to the ’558 patent by virtue of an assignment from the inventors to TechSys recorded at the USPTO at Reel/Frame 034888/0926.

52. The ’558 patent issued from U.S. Application No. 14/022,820, filed September 10, 2013, which was published as U.S. Patent Application Publication No. US2015/0071634 A1. As reflected on the face of the ’558 patent, the application that led to the ’558 patent was a continuation-in-part of Application No. 13/490,314, which issued as the ’591 patent and was filed June 6, 2012.

53. The ’558 patent is a continuation-in-part of the ’591 patent and is generally directed to “apparatus, systems and methods enabling a service provider to establish an optical demarcation point located at or within equipment controlled at least in part by a customer’s domain such that the

service provider's domain is able to directly control access of an optical signal to their domain based upon at least one optical signal characteristic and at least one of mapping and multiplexing properties pertaining to one or more information flows within said optical signal." '558 patent, Abstract. By verifying that "optical data plane signals are properly configured before they are granted access to the network," embodiments may provide "significant savings," including "cost of equipment, including equipment sparing, cost of power consumption and cost of cooling, as well as operational cost savings due to the management of fewer devices and the ability to remotely control the devices." '558 patent, 4:6-21.

54. The '558 patent issued with 21 claims. Each claim in the '558 patent recites an independent invention, and no single claim should be construed as representative of all claims in the '558 patent.

55. The '558 patent is valid and enforceable and enjoys a statutory presumption of validity pursuant to 35 U.S.C. § 282. The claims of the '558 patent satisfy all requirements for patentability and patenting under 35 U.S.C., including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112.

**The '350 Patent (Optical/Spectral Defragmentation Patent)**

56. The USPTO duly issued the '350 patent, entitled "Optical Spectrum Recovery," on April 28, 2015. The '350 patent names Edward T. Sullivan and Hal V. Kauffeldt as inventors. A true and correct copy of the '350 patent is attached hereto as Exhibit C.

57. Plaintiff TechSys is the owner by assignment of all rights, title, and interest in and to the '350 patent by virtue of an assignment from the inventors to TechSys recorded at the USPTO at Reel/Frame 034888/0926.

58. The ’350 patent issued from U.S. Application No. 13/168,811, filed June 24, 2011, which was published as U.S. Patent Application Publication No. US2012/0328296 A1.

59. The ’350 patent is generally directed to “systems and methods for re-arranging optical spectrum utilization so that unallocated portions of the spectrum may be made contiguous.” Embodiments may improve the use of available spectrum, support rapid reconfiguration, and increase network capacity.

60. The ’350 patent discloses systems and methods that may “allow[] for the rearrangement of spectrum and hence the recovery of unallocated portions into larger contiguous portions in a manner which may not require the traffic carried by the channels which are rearranged to be interrupted during the rearrangement process.” ’350 patent, 2:55-61. As described in the patent, methods include “expanding a reservation of said optical allocation from said initial allocation to at least said initial allocation and said target allocation”; “shifting said optical allocation within the expanded said reservation from said initial allocation to said target allocation”; and “collapsing the expanded said reservation to equal said target allocation.” ’350 patent, claim 1.

61. The ’350 patent issued with 7 claims. Each claim in the ’350 patent recites an independent invention, and no single claim should be construed as representative of all claims in the ’350 patent.

62. The ’350 patent is valid and enforceable and enjoys a statutory presumption of validity pursuant to 35 U.S.C. § 282. The claims of the ’350 patent satisfy all requirements for patentability and patenting under 35 U.S.C., including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112.

## THE ACCUSED SYSTEMS, PROCESSES, AND PRODUCTS

63. Defendant Verizon operates a nationwide fiber-optic network that uses the technologies claimed in the Asserted Patents. These patents are practiced at multiple points throughout Verizon's fiber optic network, including customer premises network equipment ("CPNE"), network interface devices, DWDM interfaces, controllers, coherent routers and switches, optical pluggables, ROADMs, wavelength selective switches, and other equipment located at customer sites, data centers, central offices, edge offices, switching centers, metro hubs, points of presence (POP), cellular base stations, and throughout Verizon's fiber optic network service architecture and fiber backbone.

64. Verizon purchases equipment and software from at least four major vendors for its fiber-optic networks: Nokia/Alcatel-Lucent/Infinera ("Nokia"), Ciena, Fujitsu, and Ericsson. These vendors provide, among other things, optical, packet-optical, and networking equipment and associated software, including, without limitation, reconfigurable optical add-drop multiplexers ("ROADMs"); routers and switches; coherent optical interfaces and transceivers; customer-premises or customer-network equipment ("CPE" or "CPNE"), muxponders, thin transponders, and other devices incorporating embedded or pluggable coherent optics; packet-optical platforms and other network elements incorporating packet, optical, or combined packet-and-optical functionality; and related software, including software-defined network controllers, domain controllers, network-management and network-planning systems, and orchestrators.

65. Such equipment may be deployed in various configurations, including configurations in which optical interfaces or functionality are incorporated into or associated with routers, switches, packet-optical platforms, customer-network elements, or other network equipment, and in which such equipment or functionality is managed, in whole or in part, through different network-

management or administrative domains. Verizon uses these products and services in connection with, among other things, broadband access, wavelength services, Managed Optical Fiber Network ("MOFN"), data-center services, Spectrum Services, Data Center Interconnect ("DCI"), its fiber-optic backbone, metro and regional networks, cellular and 5G backhaul and transport infrastructure, and interconnections with other service-provider networks. Verizon's use and operation of one or more of these systems, products, configurations, and services practices one or more claims of the Asserted Patents.

66. The Asserted Patents are practiced through multiple infringing configurations in Verizon's fiber-optic networks. In one or more such configurations, a network element that includes or is associated with a coherent optical interface is managed in part through Verizon's optical or transport domain and in part through a separate network-management or administrative domain, such as an IP, packet, customer, or other network domain.

67. By way of example, Verizon operates its fiber-optic networks using logically and administratively distinct network layers or domains, including an optical or transport domain and an IP or packet domain. The optical domain, sometimes referred to as the transport or DWDM layer, manages the transmission of optical signals over Verizon's fiber-optic infrastructure, while the IP or packet domain manages the routing and delivery of packet traffic over that infrastructure and within interconnected data-center, customer, access, and other networks. Verizon employs separate or domain-specific controllers, together with higher-level software-defined networking ("SDN"), orchestration, or network-management systems, to manage and coordinate these domains. In one or more accused configurations, controllers associated with the optical domain communicate, directly or indirectly, with controllers or interfaces associated with network elements at the boundary between the IP or other network domain and the optical domain. Such communications include

information concerning optical-signal parameters, including, for example, wavelength or frequency, transmit power, modulation or transmission mode, and other characteristics of the optical signal, and are used in controlling, configuring, enabling, permitting, restricting, or prohibiting transmission of optical signals over Verizon's optical network.




Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, Verizon Network Infrastructure Planning, SDN-NFV Reference Architecture, pp. 18, 55, and 62; https://www.sdxcentral.com/news/verizon-publishes-an-sdnnfv-reference-architecture/

verizon

SDN-NFV Reference Architecture v1.0




Figure 9-1: SDN Control Architecture

Figure 9-1 above is derived from Figure 2-2, which shows various SDN Controllers. A key characteristic of this architecture is that it recognizes there are multiple network domains, each with its own SDN domain controller. Control across domains occurs in two forms:

*Id.*, p. 55.

### 9.6 Domain-specific controllers

Existing Domain-specific controllers are not necessarily different from WAN SDN Controllers as discussed above. Even if a controller is only able to manage a vendor-specific domain today, with the introduction of new standards for protocols and data models, that same controller may be able to manage multi-vendor networks tomorrow. That said, a domain-specific controller exposes more limited functionality than a higher-level WAN SDN Controller. This is illustrated in the following figure:




Figure 9-5: WAN SDN Controller Plus Domain-Specific Controllers

Note: Figure 9-5 shows only a subset of functional blocks of the WAN SDN Controller.

Domain-specific SDN Controllers expose high-level topology information to the WAN SDN Controller. Based on this information the WAN SDN Controller interacts with the Domain-specific Controllers to

*Id.*, p. 62.

### 16 L1 – L3 Functions

Layer 1 – Layer 3 functions form the underlying transport infrastructure, providing connectivity for applications and other core network functions. Shown below are the various layers of a modern transport network. Some of these functions may be virtualized; however, many components of Layer 1 and Layer 2 functions are not suitable for virtualization.




Figure 16-1: Simplified View of Transport Network

*Id.*, p. 113.

68. Verizon's network relies on equipment and software that support open and industry-standard management protocols, interfaces, and data models, including, for example, NETCONF,

YANG-based models, OpenConfig, and OpenROADM. These technologies enable network controllers and management systems to communicate with, configure, and manage optical interfaces and related network elements across equipment supplied by different vendors. In one or more accused configurations, an optical-domain controller or management system is capable of independently managing optical-interface functionality, including optical transmission parameters, while an IP-domain or other controller separately manages packet-layer, routing, service, or other functionality associated with the same or related network element

**SDN and multi-layer optimisation**

The P-OTS platform, with its integrated functionality spanning layer-0 to layer-2, will have a role in multi-layer optimisation. The goal of multi-layer optimisation is to transport services on the most suitable networking layer, typically the lowest, most economical layer possible. Software-defined networking (SDN) will be used to oversee such multi-layer optimisation.

However, P-OTS, unlike servers used in the data centre, are specialist rather than generic platforms. "Optical stuff is not generic hardware," says Wellbrock. Each P-OTS platform is vendor-proprietary. What can be done, he says, is to use 'domain controllers'. Each vendor's platform will have its own domain controller, above which will sit the SDN controller. Using this arrangement, the vendor's own portion of the network can be operated generically by an SDN controller, while benefitting from the particular attributes of each vendor's platform using the domain controller.

Verizon's view is that there will be a hierarchy of domain and SDN controllers."We assume there are going to be multiple layers of abstraction for SDN," says Wellbrock. There will be no one, overriding controller with knowledge of all the networking layers: from layer-0 to layer-3. Even layer-0 – the optical layer – has become dynamic with the addition of colourless, directionless, contentionless and flexible-grid ROADM features, says Wellbrock.

Instead, as part of these abstraction layers, there will be one domain that will control all the transport, and another that is all-IP. Some software element above these controllers will then inform the optical and IP domains how best to implement service tasks such as interconnecting two data centres, for example. The transport controller will then inform each layer its particular task. "Now I want layer-0 to do that, and that is my Ciena box; I need layer-1 to do this and that happens to be a Cyan box; and we need MPLS transport to do this, and that could be Juniper," says Wellbrock, pointing out that in this example, three vendor-domains are involved, each with its own domain controller.

https://www.gazettabyte.com/home/2014/6/12/verizon-readies-its-metro-for-next-generation-p-ots.html

### 8.3 Separation of concern

Introducing policy driven governance of a large system as the service provider network may create additional complexity if based on a monolithic policy function to control the entire network. Instead, the complexity can be reduced by considering the network as a set of operational domains, or administrative domains, within a service provider. This subdivision narrows down the interaction between domains to the essentials, reducing the degrees of freedom and making the system more manageable. Some policies apply to the inter-domain interfaces, and define for example how one domain can use services from another domain. Other policies, like those that control how specific resources are used within a domain, are strictly defined and applied within an administrative domain.

As an example, the business policies may be defined at the highest level in three different contexts; Wireline, Wireless and Enterprise. As described above, these business policies can then be mapped to different service policies per administrative domains. Examples of these domains could be a transport domain (WAN), a cloud infrastructure (NFV) domain or a core network domain (EPC & IMS).

One of the key aspects of applying policy technologies is that it must allow the domain experts to state their policies in terms that make sense to them and the context. This means that the policy languages used to create statements will be different, as they serve different purposes. This does not preclude that the entire set of policies can be edited, maintained and validated (to the extent that this is possible pre-runtime) in a coherent fashion.

A system will contain many different kinds of policies, affecting system behavior in different ways. The main structuring concept is the notion of policy jurisdictions; i.e., the set of resources over which a given set of related policies can assert authority. This means that the jurisdiction is tightly coupled to ownership of, accountability for and responsibility for a set of resources. A policy jurisdiction may cover an entire administrative domain, or the domain may very well be subdivided. The subdivision can be along different dimensions: geographical regions, vendors, functionality etc. One jurisdiction may influence another via well-defined and agreed interfaces (this includes "cascaded" and "adjacent" jurisdictions).

Exhibit D, Verizon Network Infrastructure Planning, SDN-NFV Reference Architecture, p. 53.

69. Verizon also uses both embedded and pluggable optics in its fiber-optic systems "anywhere they can."

> **Performance Matters for Verizon as They Plan to Use Both Embedded and Pluggable Optics**
> Glenn Wellbrock, Director Optical Transport Planning for Verizon, talked about pluggables versus performance optimized (a.k.a. embedded) coherent modules, and how it's important to leverage the volume that the hyperscalers are using to drive lower cost and power consumption. Glenn commented that the performance of the pluggable modules they've tested has exceeded their expectations. While they still plan to use performance optimized optics, they also plan to take advantage of pluggables anywhere they can because of the benefits they can provide in lower cost and power consumption.

https://acacia-inc.com/blog/acacia-nokia-and-verizon-look-to-1-2-terabit-coherent-optics-to-maximize-network-performance/

70. Verizon's accused fiber-optic networks also perform optical and spectrum defragmentation. Verizon carries out defragmentation across its fiber-optic network, including within its ROADM-based optical line system.

> **Verizon to deploy new Alcatel-Lucent wavelength routing technology**
>
> Alcatel-Lucent (Euronext Paris and NYSE: ALU) says that Verizon will deploy a new optical wavelength routing technology on its U.S. ultra-long-haul network. Combined with the use of electrical switches, the new capability, available on the 1830 Photonic Service Switch (PSS), will enable Verizon to perform multilayer end-to-end service provisioning. The technology also supports capacity "defragmentation" as well as automated restoration, assert sources at Alcatel-Lucent.
>
> Stephen Hardy • March 30, 2015 • 3 min read

Alcatel-Lucent (Euronext Paris and NYSE: ALU) says that Verizon will deploy a new optical wavelength routing technology on its U.S. ultra-long-haul network. Combined with the use of electrical switches, the new capability, available on the 1830 Photonic Service Switch (PSS), will enable Verizon to perform multilayer end-to-end service provisioning. The technology also supports capacity "defragmentation" as well as automated restoration, assert sources at Alcatel-Lucent.

> The technology also supports "wavelength defragmentation," which Drury and Bucci said resembles memory defragmentation on a computer. Verizon can survey the wavelengths being used on its network and adjust wavelength colors so that a service uses the same color from end to end. This frees previously stranded bandwidth to be used for other services and can improve bandwidth utilization by as much as 30%.

https://www.lightwaveonline.com/network-design/dwdm-roadm/article/16651099/verizon-to-deploy-new-alcatel-lucent-wavelength-routing-technology

## ALU, Verizon Tune In to Wavelength Routing

Alcatel-Lucent adds Wave Router Engine software to existing 100G hardware to achieve new level of wavelength routing and management.

Related Content Sponsored By Acacia

As it continues to build out its long-haul 100G network, Verizon will be able to leverage new software-based wavelength routing capabilities from Alcatel-Lucent that combine existing coherent 100G technology, colorless-directionless-contentionless (CDC) ROADM technology and wavelength monitoring features with a new routing engine, the vendor announced Monday.

"Verizon will be able to tune any wavelength to any outlet port and vice versa," Sam Bucci, vice president and general manager of Alcatel-Lucent's terrestrial optics group, tells Light Reading. "We can take any color at any point in the network and connect it with any other point in the network."

While that sounds little like what CDC ROADMs are already supposed to be able to do, Bucci says the new capabilities build beyond the ability to tune such ROADMs from a central location. The vendor's Wave Routing Engine software is the newest piece ALU is adding to its existing 1830 Photonic Service Switching platform to fully enable flexible, automated wavelength routing.

Bucci says Alcatel-Lucent also worked jointly with Verizon Communications Inc. (NYSE: VZ) to develop a wavelength de-fragmentation capability that goes even further than wavelength re-use. "You can de-fragment the wave architecture in your network so you can recover wavelengths, in the same way you might de-fragment a hard drive to recover space," he says.

This announcement comes as ALU is building the second rail of Verizon's nationwide 100G network, a project that it won to much industry surprise in early 2014. (See Analyst: Infinera Loses VZ Deal to AlcaLu.)

— Dan O'Shea, Managing Editor, Light Reading

"Our wavelength routing engine is a combination of software pieces we've put together," Bucci says. "It's not just ROADMs, but the way that we combine ROADMs and multi-cast switches and optical time division reflectometers, which helps us find fiber cuts and all the software were putting together with that."

https://www.lightreading.com/optical-networking/alu-verizon-tune-in-to-wavelength-routing

71. The defragmentation is a network-wide function that may be carried out using some of the same equipment within the fiber optic and SD-WAN architecture described above. By employing the patented techniques and systems, Verizon can save significant capacity—40% or more—while minimizing or reducing any network disruption.




Figure 2: Results of defragmentation

https://www.fujitsu.com/global/about/resources/news/press-releases/2012/0919-01.html

72. The Accused Systems, Processes, and Products infringe the Patents-in-Suit, as described in detail in Counts One through Three below.

## VERIZON'S KNOWLEDGE AND REFUSAL TO LICENSE

73. Verizon has had knowledge of TechSys' patented technology since at least 2013, when TechSys' inventors personally presented the technology to Glenn Wellbrock, Verizon's Vice President of Network Planning and Chief Fiber Architect, and other Verizon engineers, as described above. At the time of those meetings, TechSys's patent applications were pending before the USPTO. TechSys informed Verizon that the material being presented was the subject of pending patent applications, and the presentations disclosed the substance of the inventions that subsequently issued as the Patents-in-Suit in 2015.

74. During those meetings, Verizon's engineers and management recognized the enormous benefits of the technology and expressed significant interest in incorporating it into Verizon's network—interest that Verizon ultimately acted upon by implementing the patented technology without authorization or compensation. On information and belief, given Verizon's direct knowledge of the pending patent applications, its expressed interest in the technology, and its subsequent implementation of that technology, Verizon was aware of the Patents-in-Suit when they issued.

75. Verizon also received actual knowledge of the patents and of their infringement at least in late 2024 or early 2025 through its membership in Allied Security Trust ("AST"), a patent-risk-management organization. In that time period, TechSys provided AST and its membership with information about the Patents-in-Suit and infringement by network providers such as Verizon. At the time, TechSys did not know the identities of the AST members. TechSys later learned that Verizon is a member.

76. Thus, Verizon was aware of the Patents-in-Suit and of its infringement on multiple occasions. Despite this knowledge—and despite Verizon's decade-long use of the patented

technology throughout its network—Verizon declined to pay a license fee. At a minimum, Verizon's continued implementation and expansion of the patented architecture despite its actual knowledge of TechSys' patents constitutes willful infringement. Alternatively, Verizon acted despite an objectively high likelihood that its actions constituted infringement of valid patents and either knew or should have known of that risk, or was willfully blind to it.

**THE ACCUSED NETWORKS, SYSTEMS, PROCESSES AND PRODUCTS INFRINGE THE ASSERTED PATENTS**

77. Defendants have directly and indirectly infringed the Asserted Patents by making, using, offering for sale, selling, and/or importing into the United States the Accused Networks, Systems, and Products, and performing the Accused Processes, as well as by inducing and contributing to the infringement of the Asserted Patents by others. Optical signals entering Verizon's DWDM transport network pass through the controlled optical-demarcation architecture and client grooming interfaces claimed in the '591 and '558 patents. In addition, Verizon's fiber optic network carries out the spectral defragmentation claimed in the '350 patent to maximize capacity across its fiber-optic infrastructure.

78. Defendants have also induced infringement of the Asserted Patents in violation of 35 U.S.C. § 271(b). Defendants have had actual knowledge of TechSys' patented technology since at least 2013, when TechSys' inventors presented the technology to Verizon personnel including Glenn Wellbrock. Defendants were informed at that time that the material being presented was the subject of pending patent applications. The Patents-in-Suit subsequently issued in 2015, and Defendants have been aware of the issued patents since that time, or at the latest since TechSys engaged with AST in 2024-2025. Despite this knowledge, Defendants have actively induced third parties—including customers, enterprise customers, government entities, wavelength services, and other users of Verizon's fiber-optic network services—to use the Accused Products and Systems in a

manner that infringes the Asserted Patents. Defendants have provided instructions, technical support, documentation, and marketing materials encouraging and facilitating such infringing use with knowledge that the induced acts constitute patent infringement, or with willful blindness to such infringement.

79. For example, Verizon markets and sells fiber optic services by providing customers with technical documentation, deployment guides, and configuration instructions that direct customers to use fiber-optic network services in a manner that practices the claimed inventions. Verizon's publicly available service descriptions, white papers, and technical specifications instruct customers on how to configure and use the accused SD-WAN, MOFN, wavelength, and DCI services (among others)—the use of each of which practices the patented optical demarcation, client grooming, and spectral defragmentation technology as described herein. Verizon's customer support personnel provide technical assistance to enterprise customers in deploying and operating these services in an infringing manner.

80. Defendants have contributed to infringement of the Asserted Patents in violation of 35 U.S.C. § 271(c). On information and belief, Defendants offer to sell, sell, and import into the United States components, equipment, and services that constitute a material part of the inventions claimed in the Asserted Patents and that are especially made or adapted for use in infringing the Asserted Patents as configured and provided by Verizon.

81. Specifically, Defendants provide customer-premises network equipment ("CPNE"), optical pluggables, coherent transceivers, packet-optical platforms, and similar equipment that are configured with firmware, software, and protocols—including OpenConfig terminal-device models and NETCONF/gNMI interfaces—that implement the claimed optical demarcation and client grooming architectures at least to their customers and configured to operate in Verizon's network.

These components are configured to convey optical signal parameters between the customer controller and provider controller over the customer demarcation control channel, and the provider controller is configured to enable and prohibit transmission of optical data plane signals in accordance with such information, as claimed in the ’591 and ’558 patents. Additionally, Defendants deploy ROADM equipment and wavelength-selective switches (and related equipment) throughout their network that are configured to perform spectral defragmentation as claimed in the ’350 patent. As configured by Verizon, these components have no substantial non-infringing use because they are designed and configured to operate within Verizon’s fiber optic and SD-WAN architecture in the manner claimed by the Asserted Patents. Defendants have known, since at least 2015, when the patents issued after TechSys presented the patented technology to Verizon personnel, and no later than January 2025, that these components, equipment, and services are especially made or adapted for use in a manner that infringes the Asserted Patents.

82. As alleged above, Defendants had knowledge of the Asserted Patents and continued to use the Accused Products despite that knowledge.

83. Defendants’ knowing and willful infringement entitles Plaintiff to damages, enhanced damages, and injunctive relief.

**COUNT I: INFRINGEMENT OF THE ’591 PATENT**

84. Plaintiff incorporates and re-alleges each of the preceding paragraphs as if fully set forth herein.

85. Defendants are not licensed, expressly or impliedly, or otherwise authorized to make, have made, use, offer for sale, import, or sell any systems for use in methods that embody the inventions of the ’591 patent.

86. Defendants have directly infringed one or more claims of the ’591 patent, including at least Claim 11, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, having made, using, offering for sale, selling, and/or importing products covered by the ’591 patent.

87. Claim 11 of the ’591 patent recites:

> 11. In an optical network connecting a customer’s network element within a customer’s network with a service provider’s network element in a service provider’s network, a system for providing optical demarcation, comprising:
>
> a customer interface within said customer’s network element,
>
> a provider interface within said service provider’s network element optically coupled to said customer interface, said customer interface for optically conveying one or more optical data plane signals to said provider interface,
>
> a provider controller within said service provider’s network,
>
> a customer controller within said customer’s network element coupled to said provider controller, wherein said customer controller and said provider controller are managed within said service provider’s network, and wherein said customer’s network element is managed at least in part, but not entirely, within said customer’s network, and
>
> a customer demarcation control channel for conveying, between said customer controller and said provider controller, information of at least one optical signal parameter associated with said one or more optical data plane signals, and wherein said provider controller is configured to enable and to prohibit the transmission of said one or more optical data plane signals in accordance with said information, and wherein said customer demarcation control channel is not demodulated with said one or more optical data plane signals at said provider controller.

88. Verizon’s Accused Systems practice each element of claim 11 of the ’591 patent. To the extent the preamble is construed to be limiting, the Accused Systems satisfy the preamble, *“[i]n an optical network connecting a customer’s network element within a customer’s network with a service provider’s network element in a service provider’s network, a system for providing optical demarcation.”* For example, the Accused Systems include network elements located at customer

premises, data centers, central or edge offices, switching centers, metro hubs, points of presence ("POPs"), and other locations that connect to equipment within Verizon's optical transport network. Such network elements include equipment incorporating optical interfaces, including embedded and/or pluggable coherent optics, and may include routers, switches, customer-network equipment, packet-optical equipment, or other devices. In one or more accused configurations, aspects of such network elements are managed through different network or administrative domains, including an optical or transport domain and an IP, packet, customer, or other domain, with optical-domain controllers managing optical functionality associated with the relevant network elements and optical transmissions into Verizon's optical network.

### 16 L1 – L3 Functions

Layer 1 – Layer 3 functions form the underlying transport infrastructure, providing connectivity for applications and other core network functions. Shown below are the various layers of a modern transport network. Some of these functions may be virtualized; however, many components of Layer 1 and Layer 2 functions are not suitable for virtualization.




Figure 16-1: Simplified View of Transport Network

Exhibit D, p. 18.




Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, pp. 55 and 62.

**SDN and multi-layer optimisation**

The P-OTS platform, with its integrated functionality spanning layer-0 to layer-2, will have a role in multi-layer optimisation. The goal of multi-layer optimisation is to transport services on the most suitable networking layer, typically the lowest, most economical layer possible. Software-defined networking (SDN) will be used to oversee such multi-layer optimisation.

However, P-OTS, unlike servers used in the data centre, are specialist rather than generic platforms. "Optical stuff is not generic hardware," says Wellbrock. Each P-OTS platform is vendor-proprietary. What can be done, he says, is to use 'domain controllers'. Each vendor's platform will have its own domain controller, above which will sit the SDN controller. Using this arrangement, the vendor's own portion of the network can be operated generically by an SDN controller, while benefitting from the particular attributes of each vendor's platform using the domain controller.

Verizon's view is that there will be a hierarchy of domain and SDN controllers. "We assume there are going to be multiple layers of abstraction for SDN," says Wellbrock. There will be no one, overriding controller with knowledge of all the networking layers: from layer-0 to layer-3. Even layer-0 – the optical layer – has become dynamic with the addition of colourless, directionless, contentionless and flexible-grid ROADM features, says Wellbrock.

Instead, as part of these abstraction layers, there will be one domain that will control all the transport, and another that is all-IP. Some software element above these controllers will then inform the optical and IP domains how best to implement service tasks such as interconnecting two data centres, for example. The transport controller will then inform each layer its particular task. "Now I want layer-0 to do that, and that is my Ciena box; I need layer-1 to do this and that happens to be a Cyan box; and we need MPLS transport to do this, and that could be Juniper," says Wellbrock, pointing out that in this example, three vendor-domains are involved, each with its own domain controller.

https://www.gazettabyte.com/home/2014/6/12/verizon-readies-its-metro-for-next-generation-p-ots.html

**8.3 Separation of concern**

Introducing policy driven governance of a large system as the service provider network may create additional complexity if based on a monolithic policy function to control the entire network. Instead, the complexity can be reduced by considering the network as a set of operational domains, or administrative domains, within a service provider. This subdivision narrows down the interaction between domains to the essentials, reducing the degrees of freedom and making the system more manageable. Some policies apply to the inter-domain interfaces, and define for example how one domain can use services from another domain. Other policies, like those that control how specific resources are used within a domain, are strictly defined and applied within an administrative domain.

As an example, the business policies may be defined at the highest level in three different contexts; Wireline, Wireless and Enterprise. As described above, these business policies can then be mapped to different service policies per administrative domains. Examples of these domains could be a transport domain (WAN), a cloud infrastructure (NFV) domain or a core network domain (EPC & IMS).

One of the key aspects of applying policy technologies is that it must allow the domain experts to state their policies in terms that make sense to them and the context. This means that the policy languages used to create statements will be different, as they serve different purposes. This does not preclude that the entire set of policies can be edited, maintained and validated (to the extent that this is possible pre-runtime) in a coherent fashion.

A system will contain many different kinds of policies, affecting system behavior in different ways. The main structuring concept is the notion of policy jurisdictions; i.e., the set of resources over which a given set of related policies can assert authority. This means that the jurisdiction is tightly coupled to ownership of, accountability for and responsibility for a set of resources. A policy jurisdiction may cover an entire administrative domain, or the domain may very well be subdivided. The subdivision can be along different dimensions: geographical regions, vendors, functionality etc. One jurisdiction may influence another via well-defined and agreed interfaces (this includes "cascaded" and "adjacent" jurisdictions).

Exhibit D, p. 53.

**Performance Matters for Verizon as They Plan to Use Both Embedded and Pluggable Optics**
Glenn Wellbrock, Director Optical Transport Planning for Verizon, talked about pluggables versus performance optimized (a.k.a. embedded) coherent modules, and how it's important to leverage the volume that the hyperscalers are using to drive lower cost and power consumption. Glenn commented that the performance of the pluggable modules they've tested has exceeded their expectations. While they still plan to use performance optimized optics, they also plan to take advantage of pluggables anywhere they can because of the benefits they can provide in lower cost and power consumption.

https://acacia-inc.com/blog/acacia-nokia-and-verizon-look-to-1-2-terabit-coherent-optics-to-maximize-network-performance/

89. The Accused Systems further include *"a customer interface within said customer's network element."* As noted above, Verizon's Accused Systems include such a customer interface. For example, in one or more accused configurations, the customer interface comprises an optical or DWDM interface within the relevant customer network element that transmits optical signals toward Verizon's optical transport network. Such interfaces may include, without limitation, embedded coherent optical interfaces, coherent optical pluggables, transceiver interfaces, or other optical interfaces incorporated into routers, switches, customer-network equipment, packet-optical platforms, or other network elements, and may connect to a ROADM, optical line system, or other equipment within Verizon's optical network.




Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, pp. 18, 55, and 62.

## 16 L1 – L3 Functions

Layer 1 – Layer 3 functions form the underlying transport infrastructure, providing connectivity for applications and other core network functions. Shown below are the various layers of a modern transport network. Some of these functions may be virtualized; however, many components of Layer 1 and Layer 2 functions are not suitable for virtualization.




Figure 16-1: Simplified View of Transport Network

Exhibit D, p. 18.

90. The Accused Systems further include "*a provider interface within said service provider's network element optically coupled to said customer interface, said customer interface for optically conveying one or more optical data plane signals to said provider interface.*" As noted above, and as shown in Exhibit D at pp. 18 and 113, Verizon's fiber-optic networks include optical interfaces associated with customer-network elements that are optically coupled to optical interfaces of service-provider network elements, including ROADMs, optical line-system equipment, and

other optical transport devices. Through these coupled interfaces, one or more DWDM optical data-plane signals are conveyed from the customer interface toward and into Verizon's optical transport network.




Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, pp. 55 and 62.

## 16 L1 – L3 Functions

Layer 1 – Layer 3 functions form the underlying transport infrastructure, providing connectivity for applications and other core network functions. Shown below are the various layers of a modern transport network. Some of these functions may be virtualized; however, many components of Layer 1 and Layer 2 functions are not suitable for virtualization.




Figure 16-1: Simplified View of Transport Network

Exhibit D, p. 18.

91. The Accused Systems further include "*a provider controller within said service provider's network.*" Verizon's Accused Systems include, for example, optical- or transport-domain

controllers, network-management systems, controllers associated with ROADMs or other optical line-system equipment, and combinations or hierarchies thereof.



**9.6 Domain-specific controllers**

Existing Domain-specific controllers are not necessarily different from WAN SDN Controllers as discussed above. Even if a controller is only able to manage a vendor-specific domain today, with the introduction of new standards for protocols and data models, that same controller may be able to manage multi-vendor networks tomorrow. That said, a domain-specific controller exposes more limited functionality than a higher-level WAN SDN Controller. This is illustrated in the following figure:



Figure 9-5: WAN SDN Controller Plus Domain-Specific Controllers

Note: Figure 9-5 shows only a subset of functional blocks of the WAN SDN Controller.

Domain-specific SDN Controllers expose high-level topology information to the WAN SDN Controller. Based on this information the WAN SDN Controller interacts with the Domain-specific Controllers to

Exhibit D, p. 62.





Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, p. 55.

## 16 L1 – L3 Functions

Layer 1 – Layer 3 functions form the underlying transport infrastructure, providing connectivity for applications and other core network functions. Shown below are the various layers of a modern transport network. Some of these functions may be virtualized; however, many components of Layer 1 and Layer 2 functions are not suitable for virtualization.




Figure 16-1: Simplified View of Transport Network

Exhibit D, p. 18.



### 9.5 WAN SDN Controller

Data Center SDN solutions are well defined, clearly bounded solutions that meet the scalability, dynamicity and multi-tenancy needs in data centers. WAN SDN solutions are emerging as the next major application of SDN and a growing number of deployments have been announced. In general, a WAN SDN controller must accomplish the following objectives:

- Northbound APIs (Or-Sdnc) for network abstraction and programmability to be used by customer-facing orchestration systems and third-party applications
- Model-driven Adaptation Layer that allows network service models to help drive north bound and south bound mappings
- Multi-layer and multi-vendor control
- Automated management of end-to-end services
- Resource optimization
- Topology discovery and rectification
- Statistics collection and processing
- Provide a control interface to hybrid/classical control mechanisms

Figure 9-3 depicts the primary functions of a WAN SDN Controller:




Figure 9-3: Functions of a WAN SDN Controller

A goal of this document is to clarify the boundaries and functions of the WAN SDN Controller. The boundaries of a WAN SDN Controller are not well defined. For example, some consider resource optimization an integral part of an SDN Controller, while others consider it a separate function or an app that runs on top of an SDN Controller. The same is true for service management. The dotted line in the Figure 9-4 below conveys that certain functions may or may not be part of the core controller:

Exhibit D, p. 59.

**8.3 Separation of concern**

Introducing policy driven governance of a large system as the service provider network may create additional complexity if based on a monolithic policy function to control the entire network. Instead, the complexity can be reduced by considering the network as a set of operational domains, or administrative domains, within a service provider. This subdivision narrows down the interaction between domains to the essentials, reducing the degrees of freedom and making the system more manageable. Some policies apply to the inter-domain interfaces, and define for example how one domain can use services from another domain. Other policies, like those that control how specific resources are used within a domain, are strictly defined and applied within an administrative domain.

As an example, the business policies may be defined at the highest level in three different contexts; Wireline, Wireless and Enterprise. As described above, these business policies can then be mapped to different service policies per administrative domains. Examples of these domains could be a transport domain (WAN), a cloud infrastructure (NFV) domain or a core network domain (EPC & IMS).

One of the key aspects of applying policy technologies is that it must allow the domain experts to state their policies in terms that make sense to them and the context. This means that the policy languages used to create statements will be different, as they serve different purposes. This does not preclude that the entire set of policies can be edited, maintained and validated (to the extent that this is possible pre-runtime) in a coherent fashion.

A system will contain many different kinds of policies, affecting system behavior in different ways. The main structuring concept is the notion of policy jurisdictions; i.e., the set of resources over which a given set of related policies can assert authority. This means that the jurisdiction is tightly coupled to ownership of, accountability for and responsibility for a set of resources. A policy jurisdiction may cover an entire administrative domain, or the domain may very well be subdivided. The subdivision can be along different dimensions: geographical regions, vendors, functionality etc. One jurisdiction may influence another via well-defined and agreed interfaces (this includes "cascaded" and "adjacent" jurisdictions).

Exhibit D, p. 53.

92. The Accused Systems further include "*a customer controller within said customer's network element coupled to said provider controller.*" For example, the Accused Systems include hardware, firmware, software, management agents, control modules, and/or combinations thereof within or associated with the relevant customer network element that correspond to an optical interface of that network element. Such functionality may reside in or be implemented through, for example, transceiver control circuitry or firmware, digital signal processing or associated control functionality, specific host-device software modules, management agents, or other control components of routers, switches, NIDs, CPNE, packet-optical platforms, or other network elements. In one or more accused configurations, such customer-controller functionality is coupled, directly or indirectly, to a provider controller. By way of further example, Verizon uses equipment and software supporting OpenConfig and related YANG-based models and management mechanisms, including NETCONF and/or gNMI, through which management agents and control software may expose, communicate, configure, or manage functionality associated with optical channels, transceivers, pluggables, and other optical-interface components. *See, e.g.,* https://www.openconfig.net/about/participants/ (listing Verizon); https://github.com/Verizon;

https://github.com/Verizon/YANG-Validator; https://github.com/Verizon/YANG-transformer; https://www.openconfig.net/docs/gnmi/gnmi-specification/.




*Figure 1. NETCONF agent architecture.*

Open Source Implementation of OpenConfig Telemetry-Enabled NETCONF Agent (2019).



Pluggable in Router Use Case

In the case where a pluggable coherent optic is inserted into a router, the hierarchical model can be simplified. In the traditional muxponder use case above, there is a physical client transceiver with its own properties which must be mapped into an intermediate logical channel. In the case of a router pluggable, there is no physical client component, only the logical components associated with the host side of the DCO transceiver. In Cisco routers, it is represented as one more Ethernet interfaces depending on the configuration.



Looking at a picture of the two optics is helpful in showing how the hierarchical structure is configured for the DCO optics.



*See,* https://xrdocs.io/design/blogs/zr-openconfig-mgmt#:~:text=OpenConfig%20defines%20and%20implements%20a,the%20ZR/ZR+%20DCO%20transceivers.

93. In addition, as described in more detail in the allegations below, Verizon's optical- or transport-domain controllers and management systems manage line-side optical parameters and functionality, including, for example, frequency or channel assignment, target output power, operational or transmission mode, modulation, baud rate, and optical-interface or transmission state. *See* https://openconfig.net/projects/models/schemadocs/yangdoc/openconfig-terminal-device.html.




Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, pp. 18, 55, and 62.

**SDN and multi-layer optimisation**

The P-OTS platform, with its integrated functionality spanning layer-0 to layer-2, will have a role in multi-layer optimisation. The goal of multi-layer optimisation is to transport services on the most suitable networking layer, typically the lowest, most economical layer possible. Software-defined networking (SDN) will be used to oversee such multi-layer optimisation.

However, P-OTS, unlike servers used in the data centre, are specialist rather than generic platforms. "Optical stuff is not generic hardware," says Wellbrock. Each P-OTS platform is vendor-proprietary. What can be done, he says, is to use 'domain controllers'. Each vendor's platform will have its own domain controller, above which will sit the SDN controller. Using this arrangement, the vendor's own portion of the network can be operated generically by an SDN controller, while benefitting from the particular attributes of each vendor's platform using the domain controller.

Verizon's view is that there will be a hierarchy of domain and SDN controllers."We assume there are going to be multiple layers of abstraction for SDN," says Wellbrock. There will be no one, overriding controller with knowledge of all the networking layers: from layer-0 to layer-3. Even layer-0 - the optical layer - has become dynamic with the addition of colourless, directionless, contentionless and flexible-grid ROADM features, says Wellbrock.

Instead, as part of these abstraction layers, there will be one domain that will control all the transport, and another that is all-IP. Some software element above these controllers will then inform the optical and IP domains how best to implement service tasks such as interconnecting two data centres, for example. The transport controller will then inform each layer its particular task. "Now I want layer-0 to do that, and that is my Ciena box; I need layer-1 to do this and that happens to be a Cyan box; and we need MPLS transport to do this, and that could be Juniper," says Wellbrock, pointing out that in this example, three vendor-domains are involved, each with its own domain controller.

[https://www.gazettabyte.com/home/2014/6/12/verizon-readies-its-metro-for-next-generation-p-ots.html](https://www.gazettabyte.com/home/2014/6/12/verizon-readies-its-metro-for-next-generation-p-ots.html)

94. The Accused Systems further include "*wherein said customer controller and said provider controller are managed within said service provider's network.*" As discussed above, Verizon's Accused Systems use separate network-management and administrative domains.

Verizon's optical/transport domain includes controllers and management systems that manage controller functionality associated with optical interfaces of relevant network elements. Separate IP, packet, customer, data-center, access, or other network domains may manage other functionality associated with those network elements.

**SDN and multi-layer optimisation**

The P-OTS platform, with its integrated functionality spanning layer-0 to layer-2, will have a role in multi-layer optimisation. The goal of multi-layer optimisation is to transport services on the most suitable networking layer, typically the lowest, most economical layer possible. Software-defined networking (SDN) will be used to oversee such multi-layer optimisation.

However, P-OTS, unlike servers used in the data centre, are specialist rather than generic platforms. "Optical stuff is not generic hardware," says Wellbrock. Each P-OTS platform is vendor-proprietary. What can be done, he says, is to use 'domain controllers'. Each vendor's platform will have its own domain controller, above which will sit the SDN controller. Using this arrangement, the vendor's own portion of the network can be operated generically by an SDN controller, while benefitting from the particular attributes of each vendor's platform using the domain controller.

Verizon's view is that there will be a hierarchy of domain and SDN controllers."We assume there are going to be multiple layers of abstraction for SDN," says Wellbrock. There will be no one, overriding controller with knowledge of all the networking layers: from layer-0 to layer-3. Even layer-0 – the optical layer – has become dynamic with the addition of colourless, directionless, contentionless and flexible-grid ROADM features, says Wellbrock.

Instead, as part of these abstraction layers, there will be one domain that will control all the transport, and another that is all-IP. Some software element above these controllers will then inform the optical and IP domains how best to implement service tasks such as interconnecting two data centres, for example. The transport controller will then inform each layer its particular task. "Now I want layer-0 to do that, and that is my Ciena box; I need layer-1 to do this and that happens to be a Cyan box; and we need MPLS transport to do this, and that could be Juniper," says Wellbrock, pointing out that in this example, three vendor-domains are involved, each with its own domain controller.

https://www.gazettabyte.com/home/2014/6/12/verizon-readies-its-metro-for-next-generation-p-ots.html

**8.3 Separation of concern**

Introducing policy driven governance of a large system as the service provider network may create additional complexity if based on a monolithic policy function to control the entire network. Instead, the complexity can be reduced by considering the network as a set of operational domains, or administrative domains, within a service provider. This subdivision narrows down the interaction between domains to the essentials, reducing the degrees of freedom and making the system more manageable. Some policies apply to the inter-domain interfaces, and define for example how one domain can use services from another domain. Other policies, like those that control how specific resources are used within a domain, are strictly defined and applied within an administrative domain.

As an example, the business policies may be defined at the highest level in three different contexts; Wireline, Wireless and Enterprise. As described above, these business policies can then be mapped to different service policies per administrative domains. Examples of these domains could be a transport domain (WAN), a cloud infrastructure (NFV) domain or a core network domain (EPC & IMS).

One of the key aspects of applying policy technologies is that it must allow the domain experts to state their policies in terms that make sense to them and the context. This means that the policy languages used to create statements will be different, as they serve different purposes. This does not preclude that the entire set of policies can be edited, maintained and validated (to the extent that this is possible pre-runtime) in a coherent fashion.

A system will contain many different kinds of policies, affecting system behavior in different ways. The main structuring concept is the notion of policy jurisdictions; i.e., the set of resources over which a given set of related policies can assert authority. This means that the jurisdiction is tightly coupled to ownership of, accountability for and responsibility for a set of resources. A policy jurisdiction may cover an entire administrative domain, or the domain may very well be subdivided. The subdivision can be along different dimensions: geographical regions, vendors, functionality etc. One jurisdiction may influence another via well-defined and agreed interfaces (this includes "cascaded" and "adjacent" jurisdictions).

Exhibit D, p. 53.

95. As an example, Verizon describes multiple SDN controllers for each domain, including a "WAN SDN Controller" that performs "Multi-layer and multi-vendor control," "Automated management of end-to-end services," and southbound interfaces such as "NETCONF" and "OpenFlow."

### 9.5 WAN SDN Controller

Data Center SDN solutions are well defined, clearly bounded solutions that meet the scalability, dynamicity and multi-tenancy needs in data centers. WAN SDN solutions are emerging as the next major application of SDN and a growing number of deployments have been announced. In general, a WAN SDN controller must accomplish the following objectives:

- Northbound APIs (Or-Sdnc) for network abstraction and programmability to be used by customer-facing orchestration systems and third-party applications
- Model-driven Adaptation Layer that allows network service models to help drive north bound and south bound mappings
- Multi-layer and multi-vendor control
- Automated management of end-to-end services
- Resource optimization
- Topology discovery and rectification
- Statistics collection and processing
- Provide a control interface to hybrid/classical control mechanisms

Figure 9-3 depicts the primary functions of a WAN SDN Controller:




Figure 9-3: Functions of a WAN SDN Controller

A goal of this document is to clarify the boundaries and functions of the WAN SDN Controller. The boundaries of a WAN SDN Controller are not well defined. For example, some consider resource optimization an integral part of an SDN Controller, while others consider it a separate function or an app that runs on top of an SDN Controller. The same is true for service management. The dotted line in the Figure 9-4 below conveys that certain functions may or may not be part of the core controller:

Exhibit D, p. 59.

96. The Accused Systems further include "*wherein said customer's network element is managed at least in part, but not entirely, within said customer's network*." As explained above, relevant customer network elements include a controller associated with optical interfaces that is managed within Verizon's optical or transport domain, while other functionality of the network element is managed within a separate IP, packet, customer, data-center, access, or other network domain.

97. For example, in one or more accused configurations, packet, routing, switching, service, or other non-optical functionality associated with routers, switches, CPNE, packet-optical platforms, or other network elements is managed through an IP, packet, customer, or other network

domain, while controller functionality associated with the optical interface is managed through Verizon's optical or transport domain.

**Verizon SDN-NFV Based Network**

The following are key features of the network based on SDN and NFV:

- Separation of control and data plane;
- Virtualization of network functions;
- Programmatic control of network;
- Programmatic control of computational resources using orchestration;
- Standards-based configuration protocols;
- A single mechanism for hardware resource management and allocation;
- Automation of control, deployment, and business processes; and
- Automated resource orchestration in response to application/function needs.

Exhibit D, p. 9.

**Enhancements to the Software Defined Networking (SDN) Concept**

The fundamental concept of 'Software Defined Networking' (SDN) changes the current network design paradigm by introducing network programmability and abstraction. In its initial, narrow definition, SDN is about separating the network control and data planes in L1, L2, L3, and L4 switches (Figure 1-1). This enables independent scaling of control plane resources and data plane resources, maximizing utilization of hardware resources. In addition, control plane centralization reduces the number of managed control plane instances, simplifies operations, and enables orchestration.

The idea of centralized network control can be generalized, resulting in the broader definition of SDN: the introduction of standard protocols and data models that enable logically centralized control across multi-vendor and multi-layer networks. Such SDN Controllers expose abstracted topology and service data models towards northbound systems, simplifying orchestration of end-to-end services and enabling the introduction of innovative applications that rely on network programmability.




Figure 1-1: SDN Concept: separation of control and data planes

Exhibit D, p. 10.




[https://xrdocs.io/design/blogs/zr-openconfig-mgmt#:~:text=OpenConfig%20defines%20and%20implements%20a,the%20ZR/ZR+%20DCO%20transceivers](https://xrdocs.io/design/blogs/zr-openconfig-mgmt#:~:text=OpenConfig%20defines%20and%20implements%20a,the%20ZR/ZR+%20DCO%20transceivers) ; [https://openconfig.net/projects/models/schemadocs/yangdoc/openconfig-terminal-device.html](https://openconfig.net/projects/models/schemadocs/yangdoc/openconfig-terminal-device.html)

```
<components xmlns="http://openconfig.net/yang/platform">
    <component>
        <name>0/0-OpticalChannel0/0/0/10</name>
        <config>
            <name>0/0-OpticalChannel0/0/0/10</name>
        </config>
        <optical-channel xmlns="http://openconfig.net/yang/terminal-device">
        <config>
            <target-output-power>-10.00</target-output-power>
            <frequency>196100000</frequency>
            <operational-mode>5005</operational-mode>
        </config>
        </optical-channel>
    </component>
</components>
```

[https://xrdocs.io/design/blogs/zr-openconfig-mgmt](https://xrdocs.io/design/blogs/zr-openconfig-mgmt).

> **Ciena**® (NYSE: CIEN) is extending the benefits of its market-leading **6500** Packet-Optical Platform to significantly increase network scalability and accelerate the move to open, virtualized, SDN-based architectures. Ciena's 6500 T-Series is purpose-built for the Terabit world, offering significantly reduced power consumption and space requirements. It enables service providers to scale their metro and regional networks to support today's voracious demand for web-scale applications like streaming video, cloud computing and virtualized, software-based networking capabilities.
>
> **Verizon** is in the process of deploying Ciena's 6500 T-Series to scale its next generation 100G metro network from both a capacity and an operational perspective, as well as efficiently distribute customizable content to end users and provide an on-demand, superior customer experience.

[https://www.ciena.com/about/newsroom/press-releases/Ciena-Helps-Service-Providers-Tackle-Web-Scale-Demands-with-6500-T-Series-Packet-Optical-Platform_prx.html](https://www.ciena.com/about/newsroom/press-releases/Ciena-Helps-Service-Providers-Tackle-Web-Scale-Demands-with-6500-T-Series-Packet-Optical-Platform_prx.html); *see also* https://www.ciena.com/about/newsroom/press-releases/Ciena-Modernizes-Packet-Networking-

with-Adaptive-IP-and-Coherent-Optics.html; https://my.ciena.com/CienaPortal/sfc/servlet.shepherd/document/download/0690z000008mxlXAAQ?operationContext=S1; https://www.ciena.com/__data/assets/pdf_file/0031/156469/Service-aware_Operating_System_DS.pdf.

98. The Accused Systems further include "*a customer demarcation control channel for conveying, between said customer controller and said provider controller, information of at least one optical signal parameter associated with said one or more optical data plane signals*." For example, the Accused Systems include control and management communications between the controller associated with the relevant optical interface and controllers or management systems within Verizon's optical or transport domain. Such communications convey information concerning one or more optical-signal parameters, including, for example, frequency or channel, output power, transmission mode, modulation, baud rate, FEC, or other optical characteristics. The control channel may be implemented directly or indirectly through management protocols, interfaces, agents, intermediate controllers, or other control-plane mechanisms, including, for example, NETCONF, gNMI, OpenConfig, YANG-based models, or vendor-specific interfaces.

**8.3 Separation of concern**

Introducing policy driven governance of a large system as the service provider network may create additional complexity if based on a monolithic policy function to control the entire network. Instead, the complexity can be reduced by considering the network as a set of operational domains, or administrative domains, within a service provider. This subdivision narrows down the interaction between domains to the essentials, reducing the degrees of freedom and making the system more manageable. Some policies apply to the inter-domain interfaces, and define for example how one domain can use services from another domain. Other policies, like those that control how specific resources are used within a domain, are strictly defined and applied within an administrative domain.

As an example, the business policies may be defined at the highest level in three different contexts; Wireline, Wireless and Enterprise. As described above, these business policies can then be mapped to different service policies per administrative domains. Examples of these domains could be a transport domain (WAN), a cloud infrastructure (NFV) domain or a core network domain (EPC & IMS).

One of the key aspects of applying policy technologies is that it must allow the domain experts to state their policies in terms that make sense to them and the context. This means that the policy languages used to create statements will be different, as they serve different purposes. This does not preclude that the entire set of policies can be edited, maintained and validated (to the extent that this is possible pre-runtime) in a coherent fashion.

A system will contain many different kinds of policies, affecting system behavior in different ways. The main structuring concept is the notion of policy jurisdictions; i.e., the set of resources over which a given set of related policies can assert authority. This means that the jurisdiction is tightly coupled to ownership of, accountability for and responsibility for a set of resources. A policy jurisdiction may cover an entire administrative domain, or the domain may very well be subdivided. The subdivision can be along different dimensions: geographical regions, vendors, functionality etc. One jurisdiction may influence another via well-defined and agreed interfaces (this includes "cascaded" and "adjacent" jurisdictions).

Exhibit D, p. 53.



### Pluggable in Router Use Case

In the case where a pluggable coherent optic is inserted into a router, the hierarchical model can be simplified. In the traditional muxponder use case above, there is a physical client transceiver with its own properties which must be mapped into an intermediate logical channel. In the case of a router pluggable, there is no physical client component, only the logical components associated with the host side of the DCO transceiver. In Cisco routers, it is represented as one more Ethernet interfaces depending on the configuration.



Looking at a picture of the two optics is helpful in showing how the hierarchical structure is configured for the DCO optics.



https://xrdocs.io/design/blogs/zr-openconfig-mgmt#:~:text=OpenConfig%20defines%20and%20implements%20a,the%20ZR/ZR+%20DCO%20transceivers ; https://openconfig.net/projects/models/schemadocs/yangdoc/openconfig-terminal-device.html



```
<components xmlns="http://openconfig.net/yang/platform">
    <component>
        <name>0/0-OpticalChannel0/0/0/10</name>
        <config>
            <name>0/0-OpticalChannel0/0/0/10</name>
        </config>
        <optical-channel xmlns="http://openconfig.net/yang/terminal-device">
        <config>
            <target-output-power>-10.00</target-output-power>
            <frequency>196100000</frequency>
            <operational-mode>5005</operational-mode>
        </config>
        </optical-channel>
    </component>
</components>
```

https://xrdocs.io/design/blogs/zr-openconfig-mgmt




*Figure 1. NETCONF agent architecture.*

Open Source Implementation of OpenConfig Telemetry-Enabled NETCONF Agent (2019).

99. The Accused Systems further include "*wherein said provider controller is configured to enable and to prohibit the transmission of said one or more optical data plane signals in accordance with said information*." In one or more accused configurations, Verizon's optical- or transport-domain controllers, including WAN SDN, ROADM, optical-line-system, or other controllers, are configured to enable and to prohibit transmission of optical data-plane signals in accordance with information concerning optical-signal parameters.

100. For example, Verizon's optical-control systems, in accordance with information concerning characteristics of the optical signal (including frequency or power), enable transmission by establishing, activating, or maintaining the applicable wavelength path, and prohibit transmission by withholding, disabling, blocking, attenuating, or otherwise restricting transmission of the optical signal. Such functionality is implemented through ROADMs or other equipment under the management of Verizon's optical or transport domain.

In particular, the technology – which will be deployed by Verizon in North America on its ultra-longhaul optical network – will allow service providers to quickly adjust wavelength connections, automate tasks on a wide scale, and identify and route around faults in fiber infrastructure – all vital capabilities necessary to deploy scalable agile optical networks.

- The Alcatel-Lucent wavelength routing capabilities are deployed on the 1830 Photonic Service Switch (PSS), which Verizon chose for its ultra-longhaul, core optical network. Verizon selected Alcatel-Lucent's 1830 PSS converged WDM/OTN/Packet based-platform as part of its transition to an optical converged infrastructure to address traffic growth and enable faster and less expensive deployment of new services.
- The wavelength routing solution consists of specialized CDC-F hardware and Wave Routing Engine (WRE) software. The WRE software provides end-to-end wavelength routing, deployment, and management capabilities. This includes unique in-band per wavelength OAM capabilities to allow for efficient monitoring of wavelength connectivity and support the rapid diagnosis and troubleshooting of potential wavelength connectivity issues, a key requirement for deploying wavelength routing in optical networks at scale.

https://www.lightreading.com/optical-networking/alu-enables-flexible-wavelength-routing-for-verizon.



**Local Control**

This section describes the control loop behavior of the Whitebox ROADM. Control is defined with respect to the external high-level ports.

The ROADM controllers are instantiated on a wavelength cross-connection basis, where each such ROADM controller has two modes of operation and parameters associated with it as defined in the YANG datamodel.

Each ROADM controller has two modes:

- Power control mode (with clamp limits)
  - the channel is brought to the target power set for the local controller within the specified accuracy and within the specified slew rates, subject to the limits set by the clamp value(s)
- Gain/loss mode
  - When initiated, this mode locks-in the gain and losses currently used in the controller acting like a hold-over mode. The local controller maintains the internal settings for loss/gain of these channels independent of the power of that channel. This allows other local controllers in the cascade to operate without creating ringing in down-stream local controllers. This segmentation is the function of the SDN controller to coordinate.

Power or loss/gain mode should be independent for each channel.

Each MW port implements a transient controller on the EDFA's which it has under its control to keep the gain constant throughout a transient event. The response is broken down into two time regimes, a short time scale to track over/undershoot of the gain controller, and a long time frame to capture the persistent offset which persists until either the local controllers can adjust (power control mode), or the ROADM controller can adjust.

***Gain Mode vs. Power Mode:***

Cascaded identical power controllers in a system is inherently un-stable. Consider a fault, such as a fiber pinch causing an increase the loss of a transmission fiber between two ROADM nodes as shown by the black arrow in the diagram above. Every node down-stream from this fault will see a drop in their input power. The nodes, in trying to maintain a constant output power will adjust the EDFA gains by increasing pump power. If each is allowed to independently change their setpoint, they can all react simultaneously which overcompensates for the power loss and leads to ringing in the system.

To avoid this, the nodes are allowed to turn channels up to their power targets, and then are switched to a gain mode which will prevent them from responding to changes in input power. The SDN controller will then be able to sense the drop of power and localize the fault to the span where it occurred. It can then adjust the gain of the node immediately down stream from the fault and all other nodes will be at their appropriate target already.



**Local Control Examples:**

***Add/Drop Channel (Wr-MW):***

1. the channel of interest is set via the NETCONF interface on the W shelf. The Wr port is updated with the appropriate far-end port information, creating a link from W-->Wr (and reverse)
2. a Cross Connect for this channel is provisioned to the ROADM from Wr-->MW which includes the appropriate control parameters, in this case, Wavelength, Power Target, and Control Mode = Power.
3. Once a compliant power level has been measured at the Wr input, the processor in the ROADM is then responsible for setting all internal details to make this channel flow happen, e.g. setting WSS ports, Amp Gains, and VOA and WSS attenuation internal targets, and taking per channel measurements using the internal OPM. This must result in the channel achieving it's specified power target within the allowable tolerance within the time specified (seetable to the left).
3.1. The same happens in the reverse direction from MW input to Wr output.
4. The node must report the actual ingress and egress channel powers and total powers measured, through the NETCONF interface
5. the ROADM controller can optionally change the control mode to "Gain" which will lock in the internal gain settings which was last used to control the power. This decouples this controller from all other cascaded controllers. However, the Add/Drop is likely to stay in Power mode.

***Express (MW-MW) Channel:***

1. a Cross Connect for this channel is provisioned to the ROADM from MW<-->MW which includes the appropriate control parameters, in this case, Wavelength, Power Target, and Control Mode = Power.
2. Once a compliant power level has been measured at the MW input, the processor in the ROADM is then responsible for setting all internal details to make this channel flow happen, e.g. setting WSS ports, Amp Gains, and VOA and WSS attenuation internal targets, and taking per channel measurements using the internal OPM. This must result in the channel achieving it's specified power target within the allowable tolerance within the time specified (see table to the left).
3. The node must report the actual ingress and egress channel powers and total powers measured, through the NETCONF interface
4. the ROADM controller can optionally change the control mode to "Gain" which will lock in the internal gain settings which was last used to control the power. This decouples this controller from all other cascaded controllers

Open ROADM MSA Specification V8.0.1.

101. The Accused Systems further include "*wherein said customer demarcation control channel is not demodulated with said one or more optical data plane signals at said provider controller*." Verizon's optical-control architecture separates control and management communications from the optical data plane. In one or more accused configurations, communications between the relevant controllers are carried over a separate management or control path, including through a data-communications network ("DCN"), an optical supervisory channel ("OSC"), management interfaces, or standards-based mechanisms such as NETCONF or gNMI. Such control-channel communications are separately received and processed by the provider controller and are not demodulated together with the optical data-plane signals.




Figure 6-2: Management and Control Architecture with vCPE Infrastructure

Exhibit D, pp. 55 and 62.

## 16 L1 – L3 Functions

Layer 1 – Layer 3 functions form the underlying transport infrastructure, providing connectivity for applications and other core network functions. Shown below are the various layers of a modern transport network. Some of these functions may be virtualized; however, many components of Layer 1 and Layer 2 functions are not suitable for virtualization.




Figure 16-1: Simplified View of Transport Network

Exhibit D, p. 18.

102. Claim 11 of the ’591 patent recites a distinct and independent invention, and Defendants’ liability for infringement of claim 11 does not depend on infringement of any other claim of the ’591 patent.

103. Defendants have also indirectly infringed one or more claims of the ’591 patent in violation of 35 U.S.C. §§ 271(b) and (c). As set forth above, Defendants have induced infringement by actively encouraging customers and third parties to use the Accused Products and Systems in a manner that infringes the ’591 patent, with knowledge of the patent and that the induced acts

constitute infringement, or with willful blindness thereto. Additionally, Defendants have contributorily infringed by offering to sell, selling, and importing components, equipment, and services—including customer-premises network equipment, packet-optical platforms, optical pluggables, and coherent transceivers configured to implement the claimed architecture—that constitute a material part of the invention, are especially made or adapted for use in infringing the ’591 patent, and have no substantial non-infringing use as configured and provided by Verizon.

104. Verizon’s infringement of the ’591 patent has been and continues to be willful. Verizon has had actual knowledge of TechSys’ patented technology since at least 2013, when TechSys’ inventors presented the technology directly to Glenn Wellbrock, Verizon's Vice President of Network Planning and Chief Fiber Architect. At that time, TechSys informed Verizon that the material being presented was the subject of pending patent applications before the USPTO. The Patents-in-Suit subsequently issued in 2015, and on information and belief, Verizon has been aware of the issued patents since that time. Despite this knowledge, Verizon continued to implement and expand its use of the patented architecture. Verizon also received notice of TechSys’ patents and infringement allegations through the AST process in 2024-2025, yet declined to take a license and continued its infringing conduct.

105. Verizon knew or should have known that its actions presented an objectively high likelihood of infringing the ’591 patent. Alternatively, Verizon was willfully blind to the risk of infringement, having taken deliberate actions to avoid learning of TechSys’s patent rights despite the 2013 meetings and AST notice. Verizon’s infringement has been deliberate and willful, warranting enhanced damages under 35 U.S.C. § 284.

106. TechSys has been damaged by Verizon’s infringement of the ’591 patent and is entitled to recover damages adequate to compensate it pursuant to 35 U.S.C. § 284, but in no event

less than a reasonable royalty. To the extent the marking provisions of 35 U.S.C. § 287 apply, TechSys has complied with such requirements or is otherwise entitled to recover damages for the full period of infringement.

107. TechSys has suffered and will continue to suffer irreparable harm as a result of Verizon's infringement of the ’591 patent unless the Court enjoins Verizon’s infringing activities pursuant to 35 U.S.C. § 283.

## COUNT II: INFRINGEMENT OF THE ’558 PATENT

108. TechSys incorporates and re-alleges each of the preceding paragraphs as if fully set forth herein.

109. Verizon is not licensed, expressly or impliedly, or otherwise authorized to make, have made, use, offer for sale, import, or sell any systems for use in methods that embody the inventions of the ’558 patent.

110. Verizon has directly infringed one or more claims of the ’558 patent, including at least Claim 13, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, having made, using, offering for sale, selling, and/or importing products covered by the ’558 patent.

111. Claim 13 of the ’558 patent recites:

> 13. In an optical network connecting a customer's network element within a customer’s network with a service provider's network element in a service provider's network, a system for providing optical demarcation, comprising:
>
> a provider interface within said service provider’s network element;
>
> a customer interface within said customer’s network element optically coupled to said provider interface for optically conveying one or more optical data plane signals to said provider interface;
>
> a provider controller within said service provider’s network;

> a customer controller within said customer's network element coupled to said provider controller, wherein said customer controller and said provider controller are managed within said service provider's network, and wherein said customer's network element is managed at least in part, but not entirely, within said customer's network; and
>
> a customer demarcation control channel for conveying, between said customer controller and said provider controller, information of at least one of a payload signal mapping property and/or a signal multiplexing property of said one or more optical data plane signals, and wherein said provider controller is configured to enable and to prohibit the transmission of said one or more optical data plane signals in accordance with said information, and wherein said customer demarcation control channel is not demodulated with said one or more optical data plane signals at said provider controller.

112. Verizon's Accused Systems practice each element of claim 13 of the '558 patent. To the extent the preamble is construed to be limiting, as explained above in ¶88, the Accused Systems include "*[i]n an optical network connecting a customer's network element within a customer's network with a service provider's network element in a service provider's network, a system for providing optical demarcation*." For example, the Accused Systems include network elements located at customer premises, data centers, central or edge offices, switching centers, metro hubs, points of presence ("POPs"), and other locations that connect to equipment within Verizon's optical transport network. Such network elements include equipment incorporating optical interfaces, including embedded and/or pluggable coherent optics, and may include routers, switches, customer-network equipment, packet-optical equipment, or other devices. In one or more accused configurations, aspects of such network elements are managed through different network or administrative domains, including an optical or transport domain and an IP, packet, customer, or other domain, with optical-domain controllers managing optical functionality associated with the relevant network elements and optical transmissions into Verizon's optical network. *See also* Exhibit D, pp. 18, 53, 55 and 62.

113. The Accused Systems further include "*a provider interface within said service provider's network element*" and "*a customer interface within said customer's network element*

*optically coupled to said provider interface for optically conveying one or more optical data plane signals to said provider interface*." As explained above in ¶¶89-90, in one or more accused configurations, the network elements include an interface that comprises an optical or DWDM interface that transmits optical signals toward Verizon's optical transport network. Such interfaces may include, without limitation, embedded coherent optical interfaces, coherent optical pluggables, transceiver interfaces, or other optical interfaces incorporated into routers, switches, customer-network equipment, packet-optical platforms, or other network elements, and may connect to a ROADM, optical line system, or other equipment within Verizon's optical network. These optical interfaces are optically coupled to optical interfaces of network elements within Verizon's fiber or optical transport network, including ROADMs, optical line-system equipment, and other optical transport devices. Through these coupled interfaces, one or more DWDM optical data-plane signals are conveyed from the customer interface toward and into Verizon's optical transport network. *See also* Exhibit D, pp. 18, 113.

114. The Accused Systems satisfy the limitation "*a provider controller within said service provider's network*." As explained in ¶91, Verizon's Accused Systems include, for example, optical- or transport-domain controllers, network-management systems, controllers associated with ROADMs or other optical line-system equipment, and combinations or hierarchies thereof. *See also* Exhibit D, pp. 18, 53, 55, 62, 113.

115. The Accused Systems further include "*a customer controller within said customer's network element coupled to said provider controller*." As set forth in ¶¶92-93, the Accused Systems may include hardware, firmware, software, management agents, control modules, and/or combinations thereof within or associated with the relevant customer network element that correspond to an optical interface of that network element. Such functionality may reside in or be

implemented through, for example, transceiver control circuitry or firmware, digital signal processing or associated control functionality, specific host-device software modules, management agents, or other control components of routers, switches, NIDs, CPNE, packet-optical platforms, or other network elements. In one or more accused configurations, such customer-controller functionality is coupled, directly or indirectly, to a provider controller. By way of further example, Verizon uses equipment and software supporting OpenConfig and related YANG-based models and management mechanisms, including NETCONF and/or gNMI, through which management agents and control software may expose, communicate, configure, or manage functionality associated with optical channels, transceivers, and other optical-interface components.

116. The Accused Systems further include "*wherein said customer controller and said provider controller are managed within said service provider's network*." As explained in ¶¶94-95, Verizon's Accused Systems use separate network-management and administrative domains. Verizon's optical/transport domain includes controllers and management systems that manage controller functionality associated with optical interfaces of relevant network elements. Separate IP, packet, customer, data-center, access, or other network domains may manage other functionality associated with those network elements.

117. The Accused Systems further include "*wherein said customer's network element is managed at least in part, but not entirely, within said customer's network*." As explained in ¶¶96-97, Verizon's network elements include a controller associated with optical interfaces that is managed within Verizon's optical or transport domain, while other functionality of the network element is managed within a separate IP, packet, customer, data-center, access, or other network domain.

118. The Accused Systems further include "*a customer demarcation control channel for conveying, between said customer controller and said provider controller, information of at least one of a payload signal mapping property and/or a signal multiplexing property of said one or more optical data plane signals*." As discussed in ¶98, the Accused Systems include control and management communications between controller functionality associated with the relevant optical interface and controllers or management systems within Verizon's optical or transport domain. Such communications include information concerning payload mapping and/or multiplexing properties of the optical data-plane signals. For example, equipment and software supporting OpenConfig and other YANG-based optical-management models provide for communication and management of OTN and logical-channel attributes relating to client-signal mapping, channel type, tributary assignments, and other payload-mapping or multiplexing characteristics. Such information may be conveyed between the relevant controllers through NETCONF, gNMI, or other management and control mechanisms.

/terminal-device/logical-channels/channel/config/trib-protocol
- Values include OTN types such as ODU2, ODU4, ODUflex.
(G.709 tributary-mapping protocol)

/terminal-device/logical-channels/channel/config/client-mapping-mode
- Modes: 1x100G, 2x100G, 4x100G.
(Defines how client signals are mapped/multiplexed)

/terminal-device/logical-channel-assignments/assignment/config/tributary-slot-index
- Identifies which OTN tributary slots the client occupies.

/terminal-device/logical-channels/channel/otn/config/tributary-slot-granularity
- Defines OPU/ODU multiplexing granularity.

/terminal-device/logical-channels/channel/state/app-code
- Identifies application code, modulation, and OTN mapping profile.

https://openconfig.net/projects/models/schemadocs/jstree/openconfig-terminal-device.html

https://openconfig.net/projects/models/schemadocs/yangdoc/openconfig-terminal-device.html




https://xrdocs.io/design/blogs/zr-openconfig-mgmt#:~:text=OpenConfig%20defines%20and%20implements%20a,the%20ZR/ZR+%20DCO%20transceivers

119. The Accused Systems further include "*wherein said provider controller is configured to enable and to prohibit the transmission of said one or more optical data plane signals in accordance with said information*." As explained in ¶¶99-100, in one or more accused configurations, Verizon's optical- or transport-domain controllers, in accordance with information conveyed over the control channel—including information concerning payload-mapping and/or signal-multiplexing properties—are configured to enable and to prohibit transmission of the corresponding optical data-plane signals. The provider-controller functionality enables transmission by establishing, activating, or maintaining an optical channel or path, and prohibits transmission by withholding, disabling, blocking, attenuating, or otherwise restricting transmission, including through ROADMs or other optical-line equipment managed within Verizon's optical or transport domain. *See also* https://openconfig.net/projects/models/schemadocs/yangdoc/openconfig-terminal-device.html#:~:text=%23%23%23%23%20%2Fterminal%2Ddevice%2Flogical%2Dchannels%2F

channel%2Flogical%2Dchannel%2Dassignments%2Fassignment%2Fconfig%2F%20%20%0Amapping%0A%0Adescription%20%3A%20%20%0ALogical%20channel%20mapping%20procedure.%20Valid%20only%20when%20the%0Aassignment%20is%20to%20an%20OTN%20logical%20channel.

120. The Accused Systems further include "*wherein said customer demarcation control channel is not demodulated with said one or more optical data plane signals at said provider controller*." As explained in ¶101, Verizon's optical-control architecture separates control and management communications from the optical data plane. In one or more accused configurations, communications between the relevant controllers are carried over a separate management or control path, including through a data-communications network ("DCN"), an optical supervisory channel ("OSC"), management interfaces, or standards-based mechanisms such as NETCONF or gNMI. Such control-channel communications are separately received and processed by the provider controller and are not demodulated together with the optical data-plane signals.

121. Claim 13 of the '558 patent recites a distinct and independent invention, and Defendants' liability for infringement of claim 13 does not depend on infringement of any other claim of the '558 patent.

122. Defendants have also indirectly infringed one or more claims of the '558 patent in violation of 35 U.S.C. §§ 271(b) and (c). As set forth above, Defendants have induced infringement by actively encouraging customers and third parties to use the Accused Products and Systems in a manner that infringes the '558 patent, with knowledge of the patent and that the induced acts constitute infringement, or with willful blindness thereto. Additionally, Defendants have contributorily infringed by offering to sell, selling, and importing components, equipment, and services—including customer-premises network equipment, packet-optical platforms, optical

pluggables, and coherent transceivers configured to implement the claimed optical demarcation architecture—that constitute a material part of the invention, are especially made or adapted for use in infringing the ’558 patent, and have no substantial noninfringing use as configured and provided by Verizon.

123. Verizon’s infringement of the ’558 patent has been and continues to be willful. For the reasons set forth in Count I, its actual knowledge of TechSys’ patented technology dates back at least to 2013-2014, when TechSys’ inventors presented that technology directly to Glenn Wellbrock, Verizon’s Vice President of Network Planning and Chief Fiber Architect, and advised Verizon that the presented material was the subject of pending patent applications before the USPTO. The Patents-in-Suit later issued in 2015, and, on information and belief, Verizon has known of those issued patents since then. Even with that knowledge, Verizon persisted in implementing and expanding its use of the patented architecture. Through the AST process in 2024-2025, Verizon also received notice of TechSys’ patents and infringement allegations, but declined to take a license and continued its infringing conduct.

124. Verizon knew or should have known that its actions presented an objectively high likelihood of infringing the ’558 patent. Alternatively, Verizon was willfully blind to the risk of infringement, having taken deliberate actions to avoid learning of TechSys’ patent rights despite the 2013 meetings and AST notice. Verizon’s infringement has been deliberate and willful, warranting enhanced damages under 35 U.S.C. § 284.

125. TechSys has been damaged by Verizon's infringement of the ’558 patent and is entitled to recover damages adequate to compensate it pursuant to 35 U.S.C. § 284, but in no event less than a reasonable royalty. To the extent the marking provisions of 35 U.S.C. § 287 apply,

TechSys has complied with such requirements or is otherwise entitled to recover damages for the full period of infringement.

126. TechSys has suffered and will continue to suffer irreparable harm as a result of Verizon's infringement of the '558 patent unless the Court enjoins Verizon's infringing activities pursuant to 35 U.S.C. § 283.

**COUNT III: INFRINGEMENT OF THE '350 PATENT**

127. Plaintiff incorporates and re-alleges each of the preceding paragraphs as if fully set forth herein.

128. Defendants are not licensed, expressly or impliedly, or otherwise authorized to make, have made, use, offer for sale, import, or sell any systems for use in methods that embody the inventions of the '350 patent.

129. Defendants have directly infringed one or more claims of the '350 patent, including at least Claim 1, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, having made, using, offering for sale, selling, and/or importing products covered by the '350 patent.

130. Claim 1 of the '350 patent recites:

> 1. A method for changing at least one of the optical frequency range and/or states of polarization of an optical allocation of an optical channel from an initial allocation to a target allocation without tearing down said optical channel and without changing the spectral width of an optical signal within said optical channel, comprising:
>
> expanding a reservation of said optical allocation from said initial allocation to at least said initial allocation and said target allocation,
>
> shifting said optical allocation within the expanded said reservation from said initial allocation to said target allocation, and
>
> collapsing the expanded said reservation to equal said target allocation.

131. Verizon's Accused Systems practice each element of claim 1 of the '350 patent. To the extent the preamble is construed to be limiting, the Accused Systems perform the preamble of claim 1 of "*changing at least one of the optical frequency range and/or states of polarization of an optical allocation of an optical channel from an initial allocation to a target allocation without tearing down said optical channel and without changing the spectral width of an optical signal within said optical channel*." As set forth below, Verizon's fiber-optic network includes DWDM transceivers and optical nodes, including ROADMs, optical transceivers, coherent routers and switches, transponders, and optical pluggables. Within that system, Verizon performs optical/spectrum/network defragmentation—changing at least one of the optical frequency range and/or states of polarization of an optical allocation of an optical channel from an initial allocation to a target allocation.

**Verizon to deploy new Alcatel-Lucent wavelength routing technology**

Alcatel-Lucent (Euronext Paris and NYSE: ALU) says that Verizon will deploy a new optical wavelength routing technology on its U.S. ultra-long-haul network. Combined with the use of electrical switches, the new capability, available on the 1830 Photonic Service Switch (PSS), will enable Verizon to perform multilayer end-to-end service provisioning. The technology also supports capacity "defragmentation" as well as automated restoration, assert sources at Alcatel-Lucent.

Stephen Hardy • March 30, 2015 • 3 min read

Alcatel-Lucent (Euronext Paris and NYSE: ALU) says that Verizon will deploy a new optical wavelength routing technology on its U.S. ultra-long-haul network. Combined with the use of electrical switches, the new capability, available on the 1830 Photonic Service Switch (PSS), will enable Verizon to perform multilayer end-to-end service provisioning. The technology also supports capacity "defragmentation" as well as automated restoration, assert sources at Alcatel-Lucent.

The technology also supports "wavelength defragmentation," which Drury and Bucci said resembles memory defragmentation on a computer. Verizon can survey the wavelengths being used on its network and adjust wavelength colors so that a service uses the same color from end to end. This frees previously stranded bandwidth to be used for other services and can improve bandwidth utilization by as much as 30%.

https://www.lightwaveonline.com/network-design/dwdm-roadm/article/16651099/verizon-to-deploy-new-alcatel-lucent-wavelength-routing-technology.

### ALU, Verizon Tune In to Wavelength Routing

Alcatel-Lucent adds Wave Router Engine software to existing 100G hardware to achieve new level of wavelength routing and management.

Dan O'Shea, Analyst, Heavyreading.com

Related Content Sponsored by Acacia

As it continues to build out its long-haul 100G network, Verizon will be able to leverage new software-based wavelength routing capabilities from Alcatel-Lucent that combine existing coherent 100G technology, colorless-directionless-contentionless (CDC) ROADM technology and wavelength monitoring features with a new routing engine, the vendor announced Monday.

"Verizon will be able to tune any wavelength to any outlet port and vice versa," Sam Bucci, vice president and general manager of Alcatel-Lucent's terrestrial optics group, tells Light Reading. "We can take any color at any point in the network and connect it with any other point in the network."

While that sounds little like what CDC ROADMs are already supposed to be able to do, Bucci says the new capabilities build beyond the ability to tune such ROADMs from a central location. The vendor's Wave Routing Engine software is the newest piece ALU is adding to its existing 1830 Photonic Service Switching platform to fully enable flexible, automated wavelength routing.

Bucci says Alcatel-Lucent also worked jointly with Verizon Communications Inc. (NYSE: VZ) to develop a wavelength de-fragmentation capability that goes even further than wavelength re-use. "You can de-fragment the wave architecture in your network so you can recover wavelengths, in the same way you might de-fragment a hard drive to recover space," he says.

This announcement comes as ALU is building the second rail of Verizon's nationwide 100G network, a project that it won to much industry surprise in early 2014. (See Analyst: Infinera Loses VZ Deal to AlcaLu.)

— Dan O'Shea, Managing Editor, Light Reading

"Our wavelength routing engine is a combination of software pieces we've put together," Bucci says. "It's not just ROADMs, but the way that we combine ROADMs and multi-cast switches and optical time division reflectometers, which helps us find fiber cuts and all the software were putting together with that."

https://www.lightreading.com/optical-networking/alu-verizon-tune-in-to-wavelength-routing.

132. Verizon's equipment vendors—including Fujitsu, Ericsson, Ciena, and Nokia—each confirm that their equipment deployed in Verizon's network performs spectral defragmentation.

### Verizon readies its metro for next-generation P-OTS

THURSDAY, JUNE 12, 2014 AT 8:45AM

Verizon is preparing its metro network to carry significant amounts of 100 Gigabit traffic and has detailed its next-generation packet-optical transport system (P-OTS) requirements. The operator says technological advances in 100 Gig transmission and new P-OTS platforms - some yet to be announced - will help bring large scale 100 Gig deployments in the metro in the next year or so.



Glenn Wellbrock

The operator says P-OTS will be used for its metro and regional networks for spans of 400-600km. "That is where we have very dense networks," says Glenn Wellbrock, director of optical transport network architecture and design at Verizon. "The amount of 100 Gig is going to be substantially higher than it was in long haul."

**Evidence that Verizon has used Fujitsu optical/transport gear**

1. **FlashWave / Packet ONP platforms**
   - Fujitsu's **FlashWave 9500** was selected by Verizon for its metro transport/packet optical upgrades.
   - Verizon has also selected Fujitsu's **FlashWave 7120 Micro Packet ONP** for edge/metro deployments.
   - Back in the 2000s, Verizon selected Fujitsu's FlashWave 4100, 4300, and 4500 ADM / optical aggregation platforms for SONET/transport services.
2. **Metro 100-Gig upgrades**
   - Verizon reportedly used Fujitsu gear (alongside Coriant / Tellabs) to introduce 100 Gb/s capability in its metro networks, including deploying FlashWave 9500.
3. **Fronthaul / xHaul / transport for wireless (CPRI/eCPRI, Ethernet)**
   - Verizon selected Fujitsu as a preferred supplier for CPRI, eCPRI, and Ethernet-multiplexing fronthaul technology (for CRAN / 5G) in 2020.

Verizon announced in April that it had selected Fujitsu and Coriant for a 100 Gig metro upgrade. The operator has already deployed Fujitsu's FlashWave 9500 and the Coriant 7100 (formerly Tellabs 7100) P-OTS platforms. "The announcement [in April] is to put 100 Gig channels in that embedded base," says Wellbrock.

The operator has 4,000 reconfigurable optical add/ drop multiplexers (ROADMs) across its metro networks worldwide and all support 100 Gig channels. But the networks are not tailored for high-speed transmission and hence the cost of 100 Gig remains high. For example, dispersion compensation fibre, and Erbium-doped fibre amplifiers (EDFA) rather than hybrid EDFA-Raman are used for the existing links. "It [the network] is not optimised for 100 Gig but will support it, and we are using [100 Gig] on an as-needed basis," says Wellbrock.

https://www.gazettabyte.com/home/2014/6/12/verizon-readies-its-metro-for-next-generation-p-ots.html.




https://www.fujitsu.com/global/documents/about/resources/publications/fstj/archives/vol50-1/paper16.pdf.



Fronthaul 6000 unlocks optical solution towards 5G for Verizon

Ericsson's leading optical product portfolio based on WDM technology was the ideal way to ensure optical connectivity to support the 5G journey for leading US service provider Verizon.

CASE | #5GPlatform

Highlights

The network centralization model has been evaluated by Verizon as a possible key stage in its evolution strategy since 2016. Back then, Verizon assessed ways of simplifying the radio area network (RAN) and reducing the use of optical fiber. The answer was an active optical fronthaul solution – Ericsson Fronthaul 6000 – to efficiently connect its 4G macro sites to a centralized baseband hotel.

Ericsson Fronthaul 6000 was introduced into the Verizon network and is now widely deployed. By serving multiple radio services over a single fiber strand, Fronthaul 6000 offers both lower operational costs and easier provisioning. Moreover, the centralization of the basebands allows for efficient radio coordination across multiple sites. This lends a new level of flexibility to the rapidly changing cellular landscape.

The benefits that Verizon enjoyed in the centralization of macro cells have since been extended to small cells. This provided a unique opportunity to explore the capabilities of Ericsson's passive solutions in Fronthaul 6000. The modularity and flexibility of Ericsson's remote outdoor solutions enabled Verizon to expand its Centralized RAN (CRAN) with multiple new installations (rail, pole, and handhole) that enabled reduced site space and concealment for faster permitting.

Next, the Fronthaul 6000 high-density solution was introduced into Verizon's network. This is a pizza-box platform that enables further footprint reduction and lower power consumption in the CRAN hub. Combined with a passive remote enclosure, it also further expands the customer network into the semi-passive application.

Positive results from the use of Fronthaul 6000 led Verizon to expand the use of Ericsson solutions into other connectivity use cases, where Ericsson's platform also confirmed its capability to interwork with 3PP routers or basebands. Fronthaul 6000 was also used to connect outdoor baseband units with centralized routers – in a backhaul scenario. Other important developments were IP and optical convergence, where Fronthaul 6000 was used to efficiently increase router bandwidth by multiplexing several 10Gbps services over a single fiber strand.

The strategic collaboration between Ericsson and Verizon continues to this day. And the 5G journey is just beginning!

https://www.ericsson.com/en/cases/2021/fronthaul-6000-to-unlock-optical-5g-for-verizon.

133. For example, Ericsson's U.S. Patent No. 9,490,927 describes a defragmentation method performed "while the lightpath continues to carry traffic, without disruption to the traffic." Similarly, Fujitsu's U.S. Patent No. 9,577,781 describes expanding the channel allocation, shifting the signal, and reducing the allocation—all without tearing down the channel.

134. The Accused Systems perform the step of "*expanding a reservation of said optical allocation from said initial allocation to at least said initial allocation and said target allocation*." Verizon's fiber-optic network equipment, including equipment provided by Ericsson and Fujitsu, performs the step of expanding a reservation of the optical allocation from the initial allocation to at least the initial allocation and the target allocation. For example, as shown in step 1 of Figure 4 of U.S. Patent No. 9,490,927 (Ericsson), the spectral resources allocated to a lightpath are increased on the lower frequency side, with the lower edge of the block moving outwards, such that the total spectral allocation encompasses the resources allocated to the lightpath in the original spectral position and the resources which will be allocated to the lightpath in the new spectral position.




Figure 4 of U.S. Patent No. 9,490,927 (Ericsson); *id*. at 7:21-48; 7:64-67; 8:24-48.

135. Similarly, as shown in Figures 6A and 6B of U.S. Patent No. 9,577,781 (Fujitsu), in response to a start of defragmentation, each node expansion-controls the WSS pass band through which the optical signal passes, expanding the pass band in the direction in which the channel is to be wavelength-shifted.

136. On information and belief, equipment provided by Verizon's other equipment manufacturers performs the same or similar optical/wavelength/spectrum defragmentation. Indeed, Verizon's fiber optic network uses equipment from multiple vendors and therefore requires consistent defragmentation techniques across that equipment to ensure seamless spectrum management and avoid disruption when reallocating optical channels across network segments supplied by different manufacturers.




*See,* Figures 6A-6G of U.S. Patent No. 9,577,781 (Fujitsu).




"In case of continuous wavelength sweep defragmentation, the required sweeping time is one key performance metric for dynamic network operation. In addition to the wavelength sweep speed of tunable lasers, the control method of bandwidth-variable wavelength selective switches (BV-WSSs) along the signal path also greatly affect overall sweeping time. ***With sequential BV-WSS control method used in [5], the passband of the BV-WSS is first opened for the entire width of spectrum slots that the signal will sweep***, then the laser is tuned from the original spectrum slot to the target slot, and finally the passband of the BV-WSS is closed at the target spectrum slot."

Optical Node Architecture and Hitless Spectrum Defragmentation for Flexible Grid Optical Networks., Wang Xi, et al. 2013.

137. The Accused Systems perform the step of "*shifting said optical allocation within the expanded said reservation from said initial allocation to said target allocation*." Verizon's fiber-optic network equipment performs the step of shifting the optical allocation within the expanded reservation from the initial allocation to the target allocation. For example, as shown in step 2 of Figure 4 of U.S. Patent No. 9,490,927 (Ericsson), the existing lightpath is moved, in frequency, from the original spectral position to the final spectral position, with the nominal central frequency changing from f1 to f0. *Id*. at 7:21-48; 7:64-67.

138. Similarly, as shown in Figure 6C of U.S. Patent No. 9,577,781 (Fujitsu), when expansion of the WSS pass band is completed, the transmission node shifts the transmission wavelength of the optical transmitter to the long wavelength side. *Id*. at 10:36-39; 10:54-57.




> "In case of continuous wavelength sweep defragmentation, the required sweeping time is one key performance metric for dynamic network operation. In addition to the wavelength sweep speed of tunable lasers, the control method of bandwidth-variable wavelength selective switches (BV-WSSs) along the signal path also greatly affect overall sweeping time. With sequential BV-WSS control method used in [5], the passband of the BV-WSS is first opened for the entire width of spectrum slots that the signal will sweep, ***then the laser is tuned from the original spectrum slot to the target slot,*** and finally the passband of the BV-WSS is closed at the target spectrum slot."

Optical Node Architecture and Hitless Spectrum Defragmentation for Flexible Grid Optical Networks., Wang Xi, et al. 2013.

139. On information and belief, equipment provided by Verizon's other equipment manufacturers performs the same or similar optical/wavelength/spectrum defragmentation. Indeed, Verizon's fiber optic network uses equipment from multiple vendors and therefore requires consistent defragmentation techniques across that equipment to ensure seamless spectrum management and avoid disruption when reallocating optical channels across network segments supplied by different manufacturers.

140. The Accused Systems perform the step of "*collapsing the expanded said reservation to equal said target allocation*." Verizon's fiber-optic network equipment performs the step of collapsing the expanded reservation to equal the target allocation. For example, as shown in step 3 of Figure 4 of U.S. Patent No. 9,490,927 (Ericsson), there is a further reconfiguration of the spectral resources allocated to the lightpath, comprising releasing the spectral resources that were allocated for the original spectral position of the lightpath. *Id*. at 7:21-48

141. Similarly, as shown in Figures 6D through 6G of U.S. Patent No. 9,577,781 (Fujitsu), when the transmission wavelength and local light wavelength shift to the long wavelength side by an amount corresponding to a WSS slot, each of the nodes closes a part of the WSS pass band corresponding to the WSS slot at the short wavelength side—reducing the pass band to equal the target allocation. *Id*. at 11:1-19.




> "In case of continuous wavelength sweep defragmentation, the required sweeping time is one key performance metric for dynamic network operation. In addition to the wavelength sweep speed of tunable lasers, the control method of bandwidth-variable wavelength selective switches (BV-WSSs) along the signal path also greatly affect overall sweeping time. With sequential BV-WSS control method used in [5], the passband of the BV-WSS is first opened for the entire width of spectrum slots that the signal will sweep, then the laser is tuned from the original spectrum slot to the target slot, ***and finally the passband of the BV-WSS is closed at the target spectrum slot.***"

Optical Node Architecture and Hitless Spectrum Defragmentation for Flexible Grid Optical Networks., Wang Xi, et al. 2013.

142. On information and belief, equipment provided by Verizon's other equipment manufacturers performs the same or similar optical/wavelength/spectrum defragmentation. Indeed, Verizon's fiber optic network uses equipment from multiple vendors and therefore requires consistent defragmentation techniques across that equipment to ensure seamless spectrum management and avoid disruption when reallocating optical channels across network segments supplied by different manufacturers.

143. Claim 1 of the '350 patent recites a distinct and independent invention, and Defendants' liability for infringement of claim 1 does not depend on infringement of any other claim of the '350 patent.

144. Defendants have also indirectly infringed one or more claims of the '350 patent in violation of 35 U.S.C. §§ 271(b) and (c). As set forth above, Defendants have induced infringement by actively encouraging customers and third parties to use the Accused Products and Systems in a manner that infringes the '350 patent, with knowledge of the patent and that the induced acts constitute infringement, or with willful blindness thereto. Additionally, Defendants have contributorily infringed by offering to sell, selling, and importing components, equipment, and services—including ROADM equipment and wavelength-selective switches configured to perform spectral defragmentation—that constitute a material part of the invention, are especially made or adapted for use in infringing the '350 patent, and have no substantial non-infringing use as configured and provided by Verizon.

145. Verizon's infringement of the '350 patent has been and continues to be willful. On information and belief, based on Verizon's knowledge of the patent applications that led to the '591

and ’558 patents, and their familiarity with TechSys through their in-person meetings, Verizon was also aware of the ’350 Patent as well. At the very least, Verizon had knowledge of the ’350 patent and of its infringement through the notice TechSys provided to AST in 2024-2025. Despite this knowledge, Verizon declined to take a license and continued its infringing conduct.

146. Verizon knew or should have known that its actions presented an objectively high likelihood of infringing the ’350 patent. Alternatively, Verizon was willfully blind to the risk of infringement, having taken deliberate actions to avoid learning of TechSys’ patent rights despite the 2013 meetings and AST notice. Verizon’s infringement has been deliberate and willful, warranting enhanced damages under 35 U.S.C. § 284.

147. TechSys has been damaged by Verizon’s infringement of the ’350 patent and is entitled to recover damages adequate to compensate it pursuant to 35 U.S.C. § 284, but in no event less than a reasonable royalty. To the extent the marking provisions of 35 U.S.C. § 287 apply, TechSys has complied with such requirements or is otherwise entitled to recover damages for the full period of infringement.

148. TechSys has suffered and will continue to suffer irreparable harm as a result of Verizon’s infringement of the ’350 patent unless the Court enjoins Verizon’s infringing activities pursuant to 35 U.S.C. § 283.

## PRAYER FOR RELIEF

TechSys respectfully requests the following relief:

A. A judgment that Verizon has infringed and continues to infringe one or more claims of each of the Patents-in-Suit;

B. A judgment that Verizon’s infringement of the Asserted Patents has been willful and deliberate;

C. An award of damages adequate to compensate TechSys for Verizon's infringement of the Patents-in-Suit pursuant to 35 U.S.C. § 284, but in no event less than a reasonable royalty, together with prejudgment and post-judgment interest;

D. An award of enhanced damages, up to and including treble damages, pursuant to 35 U.S.C. § 284 based on Verizon's willful infringement;

E. A finding that this case is exceptional and an award of attorneys' fees and costs pursuant to 35 U.S.C. § 285;

F. A permanent injunction enjoining Verizon, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from further infringement of the Patents-in-Suit pursuant to 35 U.S.C. § 283;

G. An accounting of all damages sustained by TechSys as a result of Verizon's acts of infringement;

H. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues triable thereby.

Dated: September 8, 2026

**CAHILL GORDON & REINDEL LLP**

/s/ *Patrick M. Lafferty*

Christopher C. Campbell (#444262 DC)
ccampbell@cahill.com
Britton F. Davis (#43909 CO)
bdavis@cahill.com
Alfonso Garcia Chan (#24012408)
achan@cahill.com
Patrick M. Lafferty (#1011295 DC)
plafferty@cahill.com
Matthew D. Wood (#24110548)
mdwood@cahill.com
**CAHILL GORDON & REINDEL LLP**
900 16th Street, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 862-8900

Rahul Sarkar
rsarkar@cahill.com (#5646799 NY)
**CAHILL GORDON & REINDEL LLP**
32 Old Slip, New York, NY 10005
Telephone: (212) 701-3062

Greg Love (#24013060)
glove@cjsjlaw.com
**CHERRY JOHNSON SIEGMUND JAMES PC**
104 East Houston Street, Suite 115
Marshall, Texas 75670
Telephone: (903) 212-4444
Facsimile: (903) 392-2267

*Attorneys for Plaintiff*